1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - X
UNITED STATES OF AMERICA,   :   23-CR-00159 (NRM)
                            :
                            :
    -against-               :   United States Courthouse
                            :   Brooklyn, New York
                            :
ALEX RICAURTE CRUZ,         :
                            :   April 30, 2026
          Defendant.        :   10:30 a.m.
                            :
- - - - - - - - - - - - - - - X

TRANSCRIPT OF CRIMINAL CAUSE FOR EVIDENTIARY HEARING
BEFORE THE HONORABLE NINA MORRISON
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S :

For the Government:      JOSEPH NOCELLA JR.
                         United States Attorney
                         Eastern District of New York
                            271 Cadman Plaza East
                            Brooklyn, New York 11201

                         BY:  JOSHUA DUGAN, ESQ.
                              Assistant United States Attorney

For the Defendant:       FEDERAL DEFENDERS OF NEW YORK, INC.
                            One Pierrepont Plaza
                            Brooklyn, New York 11201

                         BY:  NORA HIROZAWA, ESQ.

Court Reporter:
Jamie Ann Stanton, RMR, CRR, RPR
225 Cadman Plaza East
Brooklyn, New York 11201
(718) 613-2274
JamieStanton.edny@gmail.com

Proceedings recorded by computerized stenography.  Transcript produced by
Computer-aided Transcription.

Proceedings                                     2

(In open court.)

THE COURTROOM DEPUTY:  Criminal cause for an evidentiary hearing for case number 23-CR-00159, *USA v. Alex Cruz*.

Counsel, please state your appearance for the record, starting with the Government.

MR. DUGAN:  Good morning, Your Honor.

Josh Dugan for the Government.

With me at counsel table is paralegal specialist, Melina Piatti-Chayan.

THE COURT:  Good morning.

MS. HIROZAWA:  Good morning, Your Honor.

Nora Hirozawa, Federal Defenders, on behalf of Mr. Cruz, who is seated next to me and being assisted by the Spanish language interpreter.

Also at counsel table is our new paralegal, Emily Olic-Llano; Anneliese Merry, another paralegal from Federal Defenders; and my legal intern, Alice Militani.

THE COURT:  Good morning to you all.

I take it the interpreter does not need to be sworn, correct?

So we are here for an evidentiary hearing in this matter on the defense's Motion to Suppress on two issues in particular that I outlined at a conference that we held on March 19th, about almost six weeks ago.

Proceedings                                          3

I received, a little over 48 hours ago, a letter from the Government dated April 27th, at ECF 54, asking me to limit the scope of the defendant's cross-examination of Agent Jensen.

Before I get into that request, is Agent Jensen in the room if we are going to be talking about her testimony? We should probably excuse her.

MR. DUGAN:  No, Your Honor, she is not.

THE COURT:  Okay.

So I received this request from the Government.  I gave the defense an opportunity to respond in writing, although, given the timing, the time frame was very short, I then received a letter response from the defense on April 29th, yesterday, by my deadline set for noon.  And then late last night, a little after 10:30 p.m., I was notified that there had been a filing on the docket by the Government changing its request and now asking me to cancel today's hearing and not allow it to go forward on the ground that the defendant's two-page letter did not set forth a substantial preliminary showing, under *Franks v. Delaware*, necessary to go forward with the hearing.

So I am prepared to address that now.

Let me start by asking the Government about the timing issue.  Why was I just getting this request from you on April 27th, given that the hearing was scheduled almost

Proceedings                                    4

six weeks ago?

MR. DUGAN:  And before I start, Your Honor, would you like me to stand or sit?

THE COURT:  Either is fine.  Whatever is more comfortable.  You're welcome to sit and use the mic.

MR. DUGAN:  Your Honor, I think as the Court is aware, I was not the original assigned Assistant U.S. Attorney on this matter.  Assistant U.S. Attorney Matthew Skurnik is currently out on parental leave.  I was assigned to this matter two weeks ago.  It's obviously a voluminous record at this point.  A *Franks* hearing is not something that is typical.  It is a series of complicated legal issues.  I got up to speed as quickly as I could.

I will also say that I spent time reviewing the filings in this matter, spent time combing through the arguments made by the defendant.  I, of course, reviewed the transcript in this matter.  And at a certain point, I came to the conclusion that the defendant hasn't made any substantial preliminary showing at this point in this matter, certainly not one that the Government has had the opportunity to respond to.  And, indeed, I noted that the Court hasn't found a substantial preliminary showing with respect to any of the, either the factual issues or with respect to any of the sub-legal issues.

I thought it was -- I mean, frankly, as I was

Proceedings                                    5

preparing for this hearing, my concern was really twofold.

I guess I will just start off by saying I apologize for the timing, and it just kind of is what it is. I could have done more -- I suppose I could have done it more quickly, but I did it as quickly as I got up to speed.

But I mean, fundamentally, I think the issue here is one, as a legal matter, I think it's clear there needs to be a substantial preliminary showing made by the defendant and they haven't made it. There needs to be a finding by the Court of the substantial preliminary showing, fundamentally, so that we have an opportunity to know kind of what we're defending against.

And this became particularly clear to me as I was starting to prepare the agent in this case who is brought here to testify about a matter that she hasn't worked on in five years with her -- not only her credibility, but, frankly, as the Court is of course aware, her career on the line. And I am trying to prepare her and say, what is it that you have to know about this case, and I don't know what it is. And without the finding of a substantial preliminary showing, it is incredibly and it has been incredibly difficult for me to prepare the agent. It's incredibly difficult for me to represent the Government in a meaningful way without knowing what I'm defending against. And whether it's, you know, 48 hours ago, which, again, I apologize for,

Proceedings                                        6

or not, I think, as a legal matter, in terms of fundamental fairness to the Government, we're still in the same place here.

And I'll note, Your Honor, that in reviewing the transcript of the last proceeding, the Court invited both parties, but certainly it would have been incumbent upon defense counsel, given the Court's invitation, to submit pre-hearing briefing in this matter because it is their burden.

And, again, they haven't. Even, the only time they've referenced any of the issues that they now want a hearing on was in a reply brief, two sentences the Government never had an opportunity to respond to, and only touched on, I guess, one larger sub-issue that they now intend to cover today.

And so they never did that. They had the opportunity. It is their burden. They've never done it. And so whether it's at, you know, 48 hours or not, we're still left in the same place. And I think our argument still stands.

THE COURT: Okay, thank you.

Ms. Hirozawa, is there anything else that you want to say on the issue of the *Franks* standard as well as any related standards under the Fourth Amendment that relate to the multifamily dwelling issue and why you believe that you

Proceedings                                    7

are entitled to a hearing at this juncture that you haven't already said either in previous conferences or in your papers?

MS. HIROZAWA:  Yes, Your Honor.

I think based on the totality of the circumstances that we've outlined in our letter to the Court filed yesterday -- or -- yes, yesterday -- as well as the prior briefing and discussions at the last status conference, I do think we have met our burden for simply getting the *Franks* hearing.

My recollection, from the last status conference, was that the Court invited the parties to submit pre-hearing briefing if they wanted, but also noted that some of the issues might be better addressed in post-hearing briefing.

I do think that we certainly anticipate requesting an opportunity to brief the issues post-hearing.  And I don't think that the Government's requests that the hearing not be scheduled, despite the Court's prior findings that we had made the substantial showing required, should be given any additional weight at this juncture just because Mr. Dugan came on the case more recently.

As Mr. Skurnik discussed at the last status conference, and as the Court noted, that was six weeks before today's hearing.  This was not an emergency leave. He indicated at that time that someone else from his office

Proceedings                                              8

would be taking over this hearing.  And so I understand the position that Mr. Dugan is in, and do not envy it, but also I don't see a reason not to hold the hearing simply because the prior AUSA and the U.S. Attorney's Office generally did not take the steps to ensure he had the time he needed to review the relevant material prior to the hearing.

THE COURT:  Mr. Dugan?

MR. DUGAN:  May I respond to that, Your Honor?

THE COURT:  Yes.

MR. DUGAN:  A couple of points.

Ms. Hirozawa relies on the totality of their arguments in their papers.  Again, Your Honor, I just, I cannot stress enough that they have not said anything or pointed to any facts, have not given any reasons how they establish their burden, the substantial preliminary burden in this case.

Particularly on the issue of what I will refer to as the ACRIS issue, but it's not even accurate, because what they identified -- the sole thing they have ever identified in a briefing paper was what I will call the ACRIS issue, but that seems to have shifted and become something different entirely.  Because in their filing this week, they're no longer talking about the ACRIS issue.  They're talking about whether there was a basis for the agent to believe that there was a basement apartment -- which, as far

as I can tell, would not be relevant to the ACRIS issue -- whether there was a basement apartment based on the fact that there was a main door and that there were people from the same extended family living in the building.

So the rationale shifted from ACRIS to members of the same family living in a building and there being a main door and maybe being another door, but we would contest that fact anyway.

Then this morning, an hour and a half before we're scheduled to be here today, Ms. Hirozawa, for the first time, sends me, and as far as I know, anyone in the Government, what purports, I guess, to be a DMV record, which, there is, as far as I know, again, because there's been no briefing on this, I can't represent for sure, but based on all of my knowledge, the agent has never seen, the agent certainly never saw before.  There has been no argument about why she should see it.

So the ACRIS issue has gone from she should have checked ACRIS, to she should have known because there was a main door with people and an extended family living together, to on the morning of this hearing -- and in terms of timing, again, she sent this to me on the morning of the hearing -- now I take it her argument is going to be the agent should have --

THE COURT:  Let me just stop you there because I

don't want to get into anticipating what the arguments are going to be at this juncture.

MR. DUGAN:  But, Your Honor, with respect, that's the whole problem.  I am left -- I, and I am not speaking for myself as someone who's been added to this case, I am speaking for the Government.

THE COURT:  Yes.

MR. DUGAN:  I am in the position of anticipating whatever the possible arguments might be without any finding of a substantial preliminary showing.

THE COURT:  Okay.

MR. DUGAN:  And without any briefing from the defendant.

THE COURT:  So I understand your position.  Let me stop you there now so that we can proceed.

Mr. Dugan, I do appreciate that you are new to this case, relatively speaking.  Not yesterday, but within the last couple of weeks.  That is helpful context and mitigates some of the concerns I had when I received the letters earlier this week about the late timing of these letters and the reasons why it wasn't presented earlier.

Nevertheless, I am still concerned that this is coming very late in the process.  In addition, though I am sure this was not your intent, by repeatedly indicating that the defense had not made a substantial preliminary showing,

in your view, of the reason why a *Franks* hearing was appropriate, I did read your letters as presuming that the Court which had, out of all of the many issues presented, indicated that there were two upon which I believed that an evidentiary hearing was appropriate and were necessary to resolve what were, in my mind, substantial factual issues raised by the exhibits, the papers, and the controlling caselaw, was not aware of the governing standards or it simply disregarded them.

So I don't believe it is fair to cabin the defense's basis for a hearing to what they were able to put together while in the final stages of hearing preparation into their two-page letter that they had to submit yesterday.

So for the record -- and I do this without prejudging in any way what the evidence will show or what my conclusions will be -- out of an abundance of caution and to show you, in part, that I am not taking lightly the fact that I have allowed the defense to put any agent on the stand and to cross-examine that agent, I am going to lay out very briefly and in summary form what I believe to be the two main issues that led me to grant the defense's request for the hearing.

One is under *Franks*.  The second issue is in part a *Franks* issue, but in part relies on other Fourth Amendment

principles that aren't governed by the standards necessarily under *Franks*.

So the first issue has to do with who is, or whether the affidavit submitted in support of the warrant, had probable cause to believe or identify the person who is the, quote/unquote, user of the so-called 1304 phone.  That is, of course, the phone that it seems to be no dispute investigators had reliably traced as having set up the accounts that were used on social media to correspond with and exchange sexually explicit messages with these underage victims.

That does raise a *Franks* issue in my mind as to whether the warrant affidavit contained any misstatements or omissions that were material to the Magistrate Judge's determination as to whether the agent had provided probable cause to identify the so-called user of the 1304 phone and, specifically, the person who had exchanged these messages by inference with these underage victims.

Of course, to hold a hearing, the defense doesn't need to prove that.  They need to simply make a substantial preliminary showing, and I am certainly not prejudging that question.

I will also note, of course, though it's not disputed, but for the record, that the caselaw is clear that an agent can omit important facts or even have undisputed

Proceedings                                          13

factual inaccuracies in a warrant affidavit which don't turn out to be material.

There are also important state of mind requirements under *Franks* even where there are material omissions or misstatements in which the defense must show and the Court must find at least recklessness and, in many cases, intentionality.

So where I land on those issues, I have no idea whether or when I will make any of those findings, but I think there is a basis to have a substantial preliminary showing on those issues. That is because I have compared the warrant affidavit with its repeated characterizations of the Government's and the agent's belief that Mr. Cruz was, in Agent Jensen's words, the user of the 1304 phone with, in particular, the DD-5, documenting the interview by members of the law enforcement team with William Quinonez, the defendant's brother, in which, in that DD-5, as the parties are well aware, Mr. Quinonez was asked if that phone number was his and answered yes. That is not a statement by him, and, again, it is a paraphrase and a summary, which is why I wanted to have a hearing and hear from the parties, but it is not a statement that he is the accountholder and that is his brother's number. It is not a statement that he occasionally uses that number or it's a secondary number.

I realize that there are records for the phone

Proceedings                                        14

that the parties may intend to introduce that the agent or other representatives of the Government may have other interpretations of what that meant. But combined with the statement in the warrant affidavit at paragraph 35, that the phone was the, quote/unquote, associated with Mr. Quinonez which did not state that Mr. Quinonez had actually said that that number was his, combined with the repeated characterizations of Mr. Cruz as the so-called user of the phone, I think that readily meets the threshold for a substantial preliminary -- and I underscore preliminary, once again -- showing under *Franks*.

In addition, there is the fact that the Government had proposed and the agent more specifically had proposed in her affidavit in support of the warrant a procedure that Judge Mann, in signing off on the warrant, adopted. Namely, in paragraph 18 of the warrant, that the agents would proceed in two different ways depending on how their investigation played out at the scene upon executing the warrant in determining who is the so-called user of the phone.

Specifically, at paragraph 18, it says that law enforcement personnel can seize and search the devices that are used by the user of the 1304 phone who, at the time, was believed to be Mr. Cruz. But if it turned out that someone other than Mr. Cruz was the so-called user of the 1304

Proceedings                                          15

phone, the warrant provided only that they could seize those devices, but not search them, absent going back to the Magistrate Judge to get permission to do so.

Again, I do not know and I am not deciding whether there would be other probable cause in the affidavit that would still give them grounds to do so, whether reliance on the warrant would entitle them to the good faith exception, given their belief that it was Mr. Cruz, but I think that portion of the record certainly raises a substantial showing that the question of whose phone that was, who the user of the phone is, whether it was Mr. Cruz, his brother, or someone else in the home, was material to the Magistrate Judge's probable cause determination.

So that is my reasoning for holding the hearing briefly summarized and I think that was certainly part of what was discussed at the previous conferences, in the defense's letter of March 6th, and in the moving papers.

The second issue -- and, again, I underscore that I am only holding a hearing on two issues among the more than a dozen the defense raised in their papers -- has to do with the question of whether this is a multifamily dwelling or not and the implications of that fact, if true, under the Fourth Amendment.

As the parties know, this inquiry is rooted not just in *Franks* and the obligation of an agent to provide

truthful and accurate information to the Magistrate Judge in making that determination, but also the Fourth Amendment's particularity on probable cause requirements and the caselaw establishing a reasonable -- an obligation on the part of the agents to conduct a reasonable inquiry into whether a premises to be searched contains more than one living unit and, if so, to establish probable cause for each unit in the dwelling that they seek to search.

There is, of course, the ACRIS report regarding how the property was characterized in the mortgage records but, in addition, there is the DD-5 showing that the agents had -- or at least members of the law enforcement team had visited the home.  There is a surveillance report from Agent Jensen.  And there are Exhibits K and L, cited by the defense that, in the defense's view, provide some indication that the homes had separate entrances and that Mr. Cruz's basement apartment was not accessible from the main residence that the other family members occupied.

So this is not necessarily a *Franks* issue, although, in some cases, such as, for example, *U.S. versus Reilly,* 76 F.3d 1271, Second Circuit 1996, where the officers -- and, again, this is not this case, but it is a case in which a *Franks* violation was found -- had previously gone to the premise without a warrant, conducted an initial inspection, failed to disclose that to the magistrate judge

at the time when they went back and sought a warrant and obtained one for a multifamily dwelling.  The Court there found a clear *Franks* violation and the no good faith applied.

A similar analysis was done in *U.S. v. Wiggins*, 298 F.R.D. 7580 (EDNY 2014), in which the affiant officer had done additional record searches that revealed another family was recorded at the address in question, but withheld that from the magistrate judge.

Again, I do not know and I have no view on whether the evidence in this case will show as much, but certainly there is a relevant *Franks* inquiry that I think the defense has made, at least a preliminary showing, that they're entitled to conduct on this record.

But, in addition, I would have held an evidentiary hearing regardless of the *Franks* issues on this record given the entirety of the record that's been before me since March 6th, which is why I adjourned oral argument on that, simply on the question of whether a reasonable investigation had been done.

Let me underscore, again, that in holding this hearing, I am not prejudging that question.  I am aware the Government has raised a number of arguments about why the warrant would still be valid notwithstanding any potential particularity finding, in particular, the Government's

position that they had probable cause to seize all of the devices in the home, given the record, or that the agents were untitled to rely on the affidavit under the good faith exception and on the warrant regardless.

But I think the defense is certainly entitled to a hearing and as the tryer of fact, it is my determination, regardless of where it leads, that I would do best to resolve these complex issues on a more complete record than the one that's currently available to me.

On that note, I am relying in part on the Second Circuit's decision written by Judge Raggi in the *Lauria* case, L-A-U-R-I-A, 70 F.4th 106 (2023), in which, though the facts in that case were somewhat different and it came after a conviction, the Court found that it was error not to hold a *Franks* hearing on the question of the officer's state of mind after an initial materiality finding had been made. Even though the Court left open the possibility that on that record, even material misstatements could be, as the Court wrote, more indicative of negligence or mistake than intentional falsity or reckless disregard for the truth. But it was because the Court failed to hold that hearing that the Second Circuit found that the District Court erred. And that only underscored to me in a case on which both parties relied on the importance of having a hearing and allowing that record to be developed.

So that is the reason I am going to deny the Government's application to cancel the hearing today and will go ahead and proceed.

All right?  Okay.

Yes?

MR. DUGAN:  May I say one thing, Your Honor?

THE COURT:  Yes, yes, you may, absolutely.

MR. DUGAN:  I want to be very clear that my intent certainly was not to suggest anything improper about what the Court did.  I am speaking only and was speaking and have been speaking only from the perspective of trying to be sure we know what evidence we need to present, what we need to prepare for.

And certainly, I will say that we appreciate, regardless of our view, we appreciate the clarification. And I think that that is going to be helpful, I think, both for us and for the Court, in getting the information that is relevant, that the Court believes is relevant to its decision.

And so I note that I would also just ask, the first part of what we sought in our original letter was a ruling precluding questioning beyond the scope of whatever it was that the Court did find the defendant had made a substantial preliminary showing on.

And defendant cited Judge Kovner's decision in

*Valentin*; said Judge Kovner denied that motion. Judge Kovner did not deny that motion. Judge Kovner granted it insofar as she agreed to limit questioning to the matters on which she found a substantial preliminary finding.

And I would just ask whether the Court would be willing to do so here as well.

THE COURT: So I did, in the limited time I had yesterday, go back and try to piece together what had happened in the *Valentin* case. I think it's at best unclear, but what it appears from the transcript of the day on which the hearing was actually held was that after the judge had ruled, granted the Government's motion to limit the scope, the defense respectfully asked her to reconsider or clarify that ruling.

By the time they came into court, as I read the record, she said that it was unclear to her whether the issues to be covered with respect to the second issue with the second phone in that case actually raised a *Franks* issue or not or had any bearing on the requisite level of intent, but since the parties were here, she would allow some examination on that issue, essentially taking back her earlier order limiting the scope, and would take it question by question.

So that is the approach I am going to follow here. I don't think that it is appropriate to cabin it as narrowly

Proceedings                                    21

as the Government did in its April 27th letter, but I will see where the inquiry goes.

I think there are some related factual matters to be developed, but I certainly don't intend to let the defense conduct a fishing expedition or set the agent up for credibility findings that have nothing to do with the issues in this case.  So we'll take it as it goes.

MR. DUGAN:  Thank you, Your Honor.

THE COURT:  All right.  Thank you.

Let's proceed.

(Witness takes the stand.)

THE COURT:  Come on up and have a seat.

You can put your things in the jury box if that's easier, and we have some water for you there.

THE COURTROOM DEPUTY:  Please raise your right hand.

(Witness sworn.)

THE WITNESS:  I do.

THE COURTROOM DEPUTY:  Please state and spell your name for the record.

THE WITNESS:  Sure.

It's Elizabeth.  Last name Jensen.  It's E-L-I-Z-A-B-E-T-H.  And then J-E-N-S-E-N.

THE COURTROOM DEPUTY:  Thank you.

THE COURT:  You can have a seat, Agent Jensen,

thank you.

MR. DUGAN:  Your Honor, can I ask one preliminary question before we proceed?

THE COURT:  Sure.

MR. DUGAN:  I should have asked earlier.

Is there going to be any evidentiary dispute over the exhibits in this case?  Do we move to admit to publish, or do we just proceed?

THE COURT:  I don't know.

MS. HIROZAWA:  I don't anticipate any objections to the exhibits the Government has presented.

THE COURT:  Thank you.

MR. DUGAN:  I will just proceed with publishing them.

THE COURT:  Let's go ahead and you can go ahead and publish them.

All right.  Thank you.

**ELIZABETH JENSEN**,

called as a witness, having first been duly sworn/affirmed was examined and testified as follows:

DIRECT EXAMINATION

BY MR. DUGAN:

Q    Good morning, Agent Jensen.

A    Good morning.

Jensen - Direct - Dugan                        23

Q     Where do you work?

A     The FBI.

Q     And how long have you worked for the FBI?

A     Eleven years.

Q     Do you know why you have been called to testify today?

A     Yes.  I have been accused of not being truthful.

Q     Are you familiar with a search warrant application you swore out on August 23, 2021?

A     I am.

Q     Did you intentionally fail to omit any information that you thought was important to that search warrant application?

A     No.

Q     At the time you submitted that search warrant application, were you at all concerned that the application was wrong or that there was anything incomplete about that application?

A     No.

Q     Sitting here today, do you believe that application was true, complete, and accurate, in all material respects?

A     Yes.

Q     Before getting the details about the search warrant, I wanted to hopefully get a little information about your professional background.

      Are you currently assigned to a particular branch

in the FBI?

A    I am.

Q    Which branch is that?

A    It's National Security.

Q    And can you tell us and the Court a little about your roles and responsibility within that branch?

A    I can't.  It's classified information.

Q    How long have you been with the National Security branch?

A    Almost four years.

Q    And what were you doing prior to that time?

A    Prior to that, I was working Crimes Against Children.

Q    And how long were you working Crimes Against Children?

A    Almost six years.

Q    And prior to joining the FBI, can you give us a little bit of your professional educational background?

A    Sure.

     I have background in biology, women's studies, psychology.  That includes clinical, forensic, counseling. And I have a business administration background.  And prior, I worked as like a quality assurance performance improvement crisis intervention supervisor.  So I managed a lot of like corrective actions and licensing, crisis events with psychiatric patients.

Q    And, sorry, where were you doing that?

A    Oh, at a psychiatric hospital.

Q    Turning back to late 2020, early 2021, where were you professionally at that point?

A    So at that point, I was on the Crimes Against Children. I managed a covert technique that we used.  I was also the headquarters and New York point contact for international parental kidnapping cases.  I am also -- and then -- was a certified crisis negotiator.  I have done trainings for mental health and suicide awareness and assessment for negotiators.  I -- also part of the behavioral analysis unit program, I did EAP, which is Employee Assistant Program.  So people that have troubles or issues, they can talk to a confidential person.  I also did covert assessments or psychological assessments for covert assets.  Oh, and I also trained for, like, statement analysis to understand, like, the veracity of a statement.

Q    So you were doing a lot at that point?

A    Yeah.

Q    And that was all within your roles at the FBI?

A    That's correct.

Q    At some point, did you become involved in an investigation that led to charges against the defendant in this case, Alex Ricaurte Cruz?

A    That's correct.

Q    Can you tell us a little bit about how you became

Jensen - Direct - Dugan                    26

involved in that investigation?

A    Yes.  Another agent out of the Illinois field office contacted me in New York and they had information that -- or like a victim occurred -- or a crime occurred.  They had a victim.  They had a subject.  They wanted help in New York doing checks and assistance in that domain.

Q    And I'm sorry if you said it, I just missed it. Approximately when was that?

A    Oh, that was May, like May of 2020.

Q    Approximately May of 2020?

A    I think it was May 19th, but I don't know.

Q    Approximately May 19th?

A    Yeah, yeah.

Q    And what was the crime that was being investigated?

A    It was sexual exploitation of minors, asking for and receiving images and videos.

Q    And you said at that point you had received a request from a different field office?

A    That's correct.

Q    Is that common?  Is that something that happens?

A    Yeah.  They ask, like other offices ask.  And in this case, which is different, Illinois was going to keep the case.  So they -- and I don't know, but their AUSA talked to the AUSA here and they had decided that Illinois was going to keep the case.

So we were just assisting in their investigation. We were like an ancillary part of theirs.

Q    And at some point did your role change in that?  Were you always ancillary, or did that develop over time?

A    No.  So in February of 2021, another victim was found, came forward.  And at that point, New York then would have to, like, open a case because since there's more victims, New York would have venue to charge the case.  So at that point, New York said that we'll have to take the case.

Q    And when New York decided to take the case, what was your role?

A    I was the person that opened the case, the agent that opened the case in New York.

Q    Would that be like the lead case agent; is that fair to say?

A    That's correct.

Q    And you said that even in the ancillary role that you had, you had learned that there was a subject at that point; is that right?

A    Yeah.  Illinois had named William Quinonez as the subject.

Q    And was there any other, at that point, either when you were working in the ancillary role or early on when you take the lead investigator role, is there other evidence or other specific leads that you remember looking into at that point?

A      Yes.

So upon getting the initial lead, I had reached out to other people and other checks were done and we found out that there were multiple people in this residence.  So it wasn't just William Quinonez, but there was other -- other people listed there, too.

So we, I think at one point, said, like, there's more possibilities than just the one person.  So we start doing checks and investigative steps.

Q    And I'm sorry, you said there was a residence.  I don't think that had come up before.

So can you tell us how it came to be that there was a residence associated with William Quinonez.

A      Yeah.

I asked the case agent or the Illinois agent who was the prior case agent about, like, what he had and he sent an e-mail with information of a telephone number and a T-Mobile subpoena return that had information about the person and their address.

Q    So you saw a T-Mobile return, and the person listed was William Quinonez?

A      That's correct.

Q    And he had an address associated with him?

A      Yes.

Q    And in your mind, was the address a piece of

information that then you wanted to track down and learn more about?

A    That's correct.

Q    And you said it was a T-Mobile return, right?

A    I forget what one, I mean, he sent me, but I remember different subpoena returns and T-Mobile's one of them, yes.

Q    So let's focus on the T-Mobile return.

A    Okay, sure.

Q    As far as you know, how was it that law enforcement came to get a T-Mobile return in this case?  What were they looking into?  What information did they provide?

A    Oh, they subpoenaed the telephone number.

Q    And when you say "the telephone number" --

A    Oh.

Q    -- what telephone number is that, and why is it relevant to the investigation?

A    Sure.

     So it's the telephone number ending in 1304.  And that telephone number was associated with different social media platforms, different vanity names that were communicating with the victims.

Q    So prior to -- and correct me if anything I say is wrong.  Prior to receiving the T-Mobile subpoena return for the 1304 phone, you understood that the 1304 phone was being used to help commit these crimes in some way?

A    That's correct.

MR. DUGAN:  If we could please pull up what has been marked -- we'll pull up what's both Government Exhibit 5 and Government Exhibit 6, but we'll start with Government Exhibit 6.

(Exhibit published.)

Q    Agent Jensen, are you able to see it on the screen?

A    Yeah, it's blurry, but maybe it's just my eyes.

THE COURT:  I think it's blurry.

THE WITNESS:  Okay.  Good, I was like -- okay, that's good to know.

Q    Is that better?

A    Yes, way better, sorry.

Q    First of all, have you seen this before?

A    Yes.

Q    And can you tell all of us what it is?

A    Yes.  This is the T-Mobile that the Florida office sent and it has information regarding the 1304 number.

Q    And I would like to talk about what you thought was significant --

A    Sure.

Q    -- but just to begin, the subscriber name there, who is that?

A    That's William Quinonez.

Q    And the subscriber address, do you see that?

A    I do.  It's 78-11 87th Road, Woodhaven, New York.

Q    Just to skip ahead a little bit, at some point were you involved in executing a search warrant on 78-11 87th Road?

A    That's correct.

Q    Was that what was called the subject premises in the search warrant we are talking about today?

A    That's correct.

MR. DUGAN:  And maybe we can zoom out or scroll down.  Maybe zoom out first and then scroll down, if you can see.

Q    Was there other information in this subscriber return that you thought was important to your investigation?

A    Yes.

So there's the rate plan that indicates family plan.  There was the Contact 1, and there's also that Contact 2 number.

Q    And in Contact 1 and Contact 2, which of those numbers was significant to your investigation at that point?

A    Well, the 1304.

Q    That was the number that was associated -- that had been involved, as far as you knew, in the crimes that were being committed against children?

A    That's correct.

Q    And was there anything significant to you about the fact that the 1304 number was identified as Contact 2?

Jensen - Direct - Dugan                    32

A    Yes.

So oftentimes you'll find multiple numbers on an account and there could be other users using the other numbers.

Q    Well --

A    But coming back to the subscriber information.

Q    Even taking a step back, what was your understanding of Contact 1?  What did that mean in a T-Mobile return?

A    That was the primary contact number.

Q    And what did you understand a primary contact to be?

A    Like, with a subscriber user information.

Q    And so Contact 1 as compared to Contact 2, what's the significance of Contact 2?

A    Likely another person using that telephone number.

Q    And what did you base that on?  How did you come to that conclusion?

A    Well, training, experience, a lot of times we'll go in and there's subscriber information, but there's other telephone numbers associated with it.

Q    And in the course of your investigation -- well, let me just even take a step back from there.

At this point in 2020, or I guess, at this point we're in 2021, approximately ballpark figure, how many investigations involving Crimes Against Children had you been a part of at this point?

Jensen - Direct - Dugan                              33

A    Probably at least 75.

Q    And had you sworn out search warrant applications in connection with any of those investigations?

A    Yes.

Q    Ballpark figure, conservatively, how many search warrant applications you had sworn out?

A    Dozens.

Q    And you also had experience reviewing T-Mobile returns?

A    That's correct.

Q    And do you know whether, as part of the T-Mobile return, T-Mobile will provide additional information to help interpret data that it provides?

A    Yes.

        MR. DUGAN:  And could we look at what's been marked as Government Exhibit 5, please.

        (Exhibit published.)

        MR. DUGAN:  And if we could zoom out so we could see the whole.

Q    And are you able to see what is, I think, all or substantially all of the document on your screen?

A    Yes, I can.

Q    Do you recognize what that document is?

A    Yes.

Q    What is it?

A    So when you get the T-Mobile information, they include

Jensen - Direct - Dugan                              34

this interpreting subscriber information, so you know what you are looking at.

Q    Did you review this in connection with reviewing the T-Mobile return that we just looked at?

A    I did.

Q    And in this document, is there information that you think is particularly relevant to understanding the T-Mobile subpoena return?

A    Yes.

So first, the subscriber name says name associated with billing for this phone number.

Q    So the subscriber name, that's a name associated, does that have any significance to you?

A    Yeah.

I mean, it says associated and that's who the account is subscribed to.

Q    And I guess since we were talking about it --

MR. DUGAN:  I think we have to go to the next page.

Q    Contact 1, what's the explanation for what Contact 1 is?

A    So that's a primary contact phone number.

Q    And what do you understand primary contact phone number to be?

A    To be likely the person subscribed to the account.

Jensen - Direct - Dugan                    35

Q    Meaning, could you be a little more specific about that?  Sorry?

A    Yeah.

So the subscriber information likely using Contact 1.

Q    The subscriber of record likely using Contact 1?

A    Correct.

MR. DUGAN:  Could we look at Contact 2, which I think is the next page?  Yes.

Q    And what does it say next to Contact 2?

A    The secondary contact phone number.

Q    And what did you understand that to be?

A    To have another telephone number associated with the records and another user using that Contact 2.

Q    Based on your training and experience and your involvement in investigations to this point, did you understand that there were times where a subscriber would pay for a phone number that was used by someone else?

A    Yes.

Often parents have the subscriber name or girlfriends or wives or significant others, so oftentimes a subscriber name isn't the user.

Q    Have there been times previously where you found that the user of a phone is not the same person as listed on the subscriber name on a subpoena return?

Jensen - Direct - Dugan                    36

A    Yes.

Q    Is that something that happens frequently, not infrequently?  How would you describe it, if you could?

A    Pretty frequently.

Q    And let me just ask, after you saw the subpoena return, did you think that you had enough information to execute a search warrant on what we've called the subject address?

A    No.

Q    Why is that?

A    Because just because there's a Contact 2 and possibly different user, that user might not be in that residence. You have to do more work.

Q    So I just want to try to break that down.

        The fact that the number that you were focused on was Contact 2 --

A    Correct.

Q    -- what was significant about that vis-a-vis the address?

A    Wait.  Say that one more time?

Q    The fact that it was Contact 2 was the number that you were focused on, did that give you any confidence that Contact 2 or did it give you any particular confidence that Contact 2 was actually associated with the address at that point?

A    No, not yet.

Jensen - Direct - Dugan                    37

Q    So what did you do?

A    So we did more investigative steps.

Q    Can you talk a little bit about the additional investigative steps you took?

A    We sent subpoenas.  We did record checks.  We contacted other law enforcement.  We talked to other contacts.  We execute search warrants.  Grand jury subpoenas.

Q    And was all or most of this investigation geared towards finding out who was the user of the 1304 phone?

A    That's correct.

Q    Because based on the subpoena returns from T-Mobile, you did not believe you had enough information to establish the user?

A    That's correct.

Q    And you talked about the legal process that you served and investigative steps that you took to identify the user.

Were there any particularly important pieces of information that you found as part of that investigation?

A    Yes.  So I sent a grand jury -- no, a subpoena to Uber first.  And that came back with information related to Alex Ricaurte.

Q    When you say you sent a subpoena to Uber, what information were you seeking from Uber?

A    The telephone number.

Q    You sent the telephone number -- just to be clear, you

Jensen - Direct - Dugan                38

sent the telephone number to Uber?

A     That's correct.

Q     The 1304 number?

A     Yes.

Q     And what information were you requesting?

I'm sorry to break it down, but I think it's sometimes easier to make sure we go piece by piece.

A     Okay.

Q     So you sent the 1304 number to Uber.

A     Correct.

Q     And what information did you request about that from Uber?

A     Any identification related to it.  I would have to look at the subpoena to see what I -- what I wrote, but, yeah, so information related to the 1304.

Q     And did you get information from Uber related to the 1304 number?

A     I did.

MR. DUGAN:  If we could please pull up what's been marked as Government Exhibit 7.

(Exhibit published.)

Q     We can look at the first page first, but Agent Jensen, do you recognize what this is?

A     Yes.

Q     Have you seen it before?

A    Yes.

Q    And what is it?

A    It's the cover letter that Uber sent back.

Q    To a subpoena return?

A    That's correct.

MR. DUGAN:  And then if we could look at the second page, please.

Q    What is this?

A    That's the information they provided to me.

Q    And can you summarize what this information is?

A    Sure.  It has the name, phone number, e-mail address, but no billing information.

Q    And what was the name that Uber provided?

A    It was Alex Ricaurte.

Q    And what was the e-mail address that they provided?

A    AFRCruz527@gmail.com.

Q    And what, if anything, was significant about this to you in terms of your investigation?

A    Well, A, Alex, F, then Ricaurte Cruz.  And then the 527.  His birthday is May 27th.

Q    How did you know that?

A    Based on my investigation up to this point, documents, record checks.

Q    So that was significant to you about the e-mail listed there?

Jensen - Direct - Dugan                    40

A     That's correct.

Q     And what did you conclude was likely about that e-mail?

A     That that was his e-mail.

Q     And just what about the fact that the name returned for the 1304 number was Alex Ricaurte?

A     That's correct.

Q     Was anything about that significant to you?

A     Yes.  The name was -- I mean, the name and telephone number associated was 1304.

Q     And what did you conclude from that?

A     That he was the user of the Uber account, and in Uber accounts, you can only have one telephone number.

Q     And so what did you conclude based on piecing that together?

A     So if you can only have one telephone number for the Uber account, then you -- then that person's the user of 1304.

Q     You concluded that he was the user of the 1304 phone at that point?

A     The 1304 was the Uber account and he had -- like, he owns the account.

Q     So what did you think he was doing with the 1304 number?

A     He was using the 1304.

Q     Okay, understood.

Jensen - Direct - Dugan                    41

A     Okay.

Q     And was that all you did to confirm, in your view, who the user of the 1304 number was?

A     No.  We sent a grand jury subpoena to Uber.  And then we also had DSS records -- or we found the Department of Social Services, that his name, address, and telephone number came back to those records.

Q     And, sorry to do this again, what is DSS?

A     Department of Social Services.

Q     And so can you be a little more specific about what you or the FBI did with respect to DSS?

A     Yes.

        So we have NYPD detectives and TFOs.  And the detective I worked with, Detective Harkins, he has a contact over there, and he was able to gather that information and then he told me.

Q     And what specifically was the information you gathered, or what did he tell you he gathered?

A     Was that the name, Alex Ricaurte, address, and telephone number was listed in their records.

Q     And what telephone number was that?

A     The 1304.

Q     And what was the address?

A     The subject premises, address.

Q     What we have been calling the subject premises?

Jensen - Direct - Dugan                    42

A    Correct.

Q    Was listed in DSS records?

A    Correct.

Q    Was that all you did?

A    No.  We had more.

Q    Can you say what else you did, or at least what else you remember doing?

A    Sure.

I also contacted our postal contact and he provided information as to who received mail at that address.

And I also contacted our ACS contact who provided Department of Education records that listed Alex Ricaurte's two sons listed at the subject premise.  And they both had the 1304 as their contact number, which is, like, the parent or guardian.

Q    So you submitted a request to the Department of Education regarding the 1304 number?

A    No.  I didn't submit a request to DOE.  I contacted our ACS contact.

Q    And what's ACS, I'm sorry?

A    Administration of Children's Services.

Q    Okay.

A    And he provided the records from DOE that listed that information.

Jensen - Direct - Dugan                    43

THE COURT:  And can you just explain again, when you say "listed that information," what information did you get from the DOE via the ACS contact about that number and who was associated with it?

THE WITNESS:  Perfect.

So I had asked the ACS contact -- because we're trained to talk to them and ask if there's any kids at the address.

THE COURT:  Sure.

THE WITNESS:  So we reach out to them and ask if there's any kids and I provided him the subject premises address as well as the telephone number that we had.  And then when he e-mailed me back, he, per the DOE records, he listed Alex Ricaurte's two sons.  So I forget their dates of birth, but there's two, and they have the same subject premise address for both.  And then they also had the same 1304 for both.  And that was in the e-mail.

THE COURT:  And when you say "for both," you mean for the contact for their parent or guardian or as their number?

THE WITNESS:  No, no.

So the number that ACS provided was either like the parent or guardian, like parent or guardian and the 1304 were like both.

THE COURT:  Okay.

Jensen - Direct - Dugan                    44

MR. DUGAN:  Your Honor, on this point, I have a document reflecting this.

THE COURT:  Okay.

MR. DUGAN:  The one concern I have that I realize right now is it does have the names of minor children on it. The names of the minor children are relevant.  I don't know how the Court wants to proceed in terms of publishing them?

THE COURT:  I think --

MS. HIROZAWA:  Your Honor, they're no longer minor children to the extent that's relevant.

THE COURT:  I think what we could do is just put it on the screen for me, the witness, and defense counsel so that we're not showing it to the audience so that since they were minors at the time, why don't we just, out of an abundance of caution, do that.

MR. DUGAN:  Can we please bring up what's been marked as 3500-2?

(Exhibit published.)

THE WITNESS:  Oh, yeah, this is it.

Q    So Agent Jensen, does this reflect what you were just talking about with the Court?

A    Yeah.

This is what I was trying to describe.  I had reached out and I provided the address, telephone number. And then he responded back with the information pertaining

Jensen - Direct - Dugan                45

to the children, the telephone number, and the address.

Q    And so what did you understand was the relevance of this information?

A    Was that those are Alex Ricaurte's children, and that is the parent or guardian telephone number.

Q    Because, in your understanding, children at school, the contact for children at school is their parent or guardian?

A    Correct.

             MR. DUGAN:  We can take this down, please.

             Unless, Your Honor, you have any other questions about it?

             THE COURT:  No, thanks.

Q    I now want to talk to you a bit about a DD-5 that has come up in the course of these proceedings.

             Do you know what I am referring to when I say DD-5?

A    I do.

Q    What is a DD-5?

A    That is how the NYPD documents their -- it's kind of like our sentinel, is, from my understanding.

Q    A report --

A    Yeah.

Q    -- a type of report filed by the NYPD?

A    That's correct, yes.

Q    At some point in your investigation into the user of

Jensen - Direct - Dugan                    46

the phone, did you become aware of a DD-5 that contained information about an interview with William Quinonez?

A    Yes.

Q    And did you become aware of this information before you swore out the search warrant in this case?

A    We did.

Q    Do you remember approximately when you learned about the DD-5?

A    I think it was maybe July 12th approximately, 2021.

Q    And you reviewed that information?

A    I did.

Q    As part of your investigation?

A    Yes.

        MR. DUGAN:  Can we please pull up what's been marked as Government Exhibit 4, and then I think we can go right to page 10.

        (Exhibit published.)

Q    Before we scroll in, do you recognize generally what this is?  Do you see enough to know what it is?

A    Yeah, I know what it is.  It's blurry -- I mean, unless my eyes --

Q    But what is it, based on what you can see?

A    This is the interview that they did, the detectives did.

Q    The DD-5 is the interview?

Jensen - Direct - Dugan                    47

A    That's correct.

Q    And this is the one that you reviewed?

A    Yes.

        MR. DUGAN:  Can we zoom in on the part that has the summary of the investigation?

Q    And do you need to read it?

        What, if anything, did you think was at least relevant to the 1304 phone from this report?

A    The middle section where they ask him about the 1304 and he stated yes.

Q    So --

A    That was the first part that was important.

        MR. DUGAN:  If we could just zoom out to see what the full sentence is.

Q    I then asked --

A    Do you want me to read it?

Q    Yes.  I thought part of it was cut off.

A    No, no, you are good.  I can read it.

        I then asked him if his phone number was 718-296-1304, and again he stated yes.

Q    What was the significance, if any, of that statement to you in the report?

A    Well, first, I wanted to understand what happened and what questions were asked.  And then I understood that to be him saying the 1304 was his number.

Jensen - Direct - Dugan                48

Q    And standing alone, did it affect your view at that point as to who was the user of the 1304 phone?

A    No.

Q    Why not?

A    Because the subscriber information has that number associated with him on that account, so yes, that's on his account.  And then we wanted to understand who was the user of 1304.  Having the number on your account and using the 1304 are different things.

Q    As far as you can tell, is this report a verbatim transcript of what was said at the interview?

A    I can't tell that.  There's no --

THE COURT:  I don't think she's able to answer that question.

A    -- like no direct quotes or anything.

Q    Meaning, based on your general practice, your general training and experience, are DD-5s a verbatim report --

A    No.

Q    -- of these interviews?

A    No.

Q    So you had your view, it sounds like, when you read it as to what it meant, but did you just say this is what it meant and I am going to move on, or did you try to find additional information?

A    We did.

Jensen - Direct - Dugan                               49

So the detective I was working with, he attempted to contact the main detective, I think it was Caesar. He -- the detective couldn't get ahold of him, he had since retired. So after not being able to get ahold of that detective, he went to his partner that was also out with him that day who vaguely recalled what transpired. All he could provide was that he thought they were being, like, recorded.

THE COURT: I'm confused. Maybe you are going to clean this up.

Who was trying to contact whom? You said a detective tried to contact the detective?

THE WITNESS: Yes, true. Sorry.

So the detective that I had been working with, Detective Harkins, he didn't know the first person, but tried, that guy had retired. But he knew the second person, so he contacted --

THE COURT: The two people listed on the DD-5, meaning?

THE WITNESS: Correct, yes. Sorry.

THE COURT: Got it. Understood.

Q    And so what, if any, relevant information were you able to obtain from Detective Harkins about that conversation?

A    That they didn't recall, like, the questions asked, like what actually happened during that interaction.

Q    Fair to say you didn't get any more relevant

Jensen - Direct - Dugan                    50

information from that conversation?

A    Correct.

Q    And what about any other steps that were taken to find out about this conversation?

A    Yeah.  So they listed a Hernandez that had gone previously.  And I had worked cases with Detective Hernandez.  So then I reached out to him to see, hey, what do you know, like, can we talk.

Q    And did you eventually have a conversation with Detective Hernandez?

A    I did.

Q    What, if anything, do you remember about that conversation?

A    Nothing.  All I remember him saying was that Mr. Quinonez thought that he was at the residence having something to do with Quinonez's son who was applying for, like, law enforcement positions.

Q    So fair to say that Detective Hernandez did not provide you any additional information about the question or about the phone or anything like that?

A    Correct.

Q    I now want to go through the warrant in a bit, but before we do that, just to kind of make sure we understand what we are going to be looking at, is it your understanding that multiple versions or multiple drafts of this warrant

Jensen - Direct - Dugan                      51

were submitted to the Magistrate Judge?

A    Yes.

Q    And to the extent you can remember, can you explain to us what happened in that process or what you know about what happened in that process?

A    I remember we submitted the application and then I'm pretty sure it all happened on the one day and my understanding from the AUSA was that the judge knew that there were more people in the house and wanted to make sure we weren't taking devices from just anybody.  And so they were being protective of the other people in the house.  So she wanted it limited to, like, one user or limited in scope.

Q    I'm sorry, what limited?  Your understanding is the magistrate --

         MS. HIROZAWA:  Objection, calls for hearsay of which she has no personal knowledge.

         THE COURT:  I am not sure what the relevance is of her recollection of what the AUSA was told by the MJ.

         MR. DUGAN:  We can go through it.  We can just go through it to clarify it.

         THE COURT:  Yes.

         MR. DUGAN:  So if we could look, first, at 3500-35.

         THE COURT:  We don't have to do it now, but I

Jensen - Direct - Dugan                    52

think it would be helpful to the extent you are going to have the witness comment on 3500 material, I know one e-mail to the DOE also came up, that we get those entered into evidence at the hearing.  You may want to do it later, but you may want to give exhibit numbers and letters later.

MR. DUGAN:  Absolutely.

THE COURT:  Sure.

(Exhibit published.)

Q    So Agent Jensen, do you recognize at least the cover page of this document?

A    I do.

Q    And then if we look to the next page -- well, just looking at the cover page, do you see a signature next to the Magistrate Judge line there?

A    No.

Q    And do you see a date?

A    Yes.

Q    What's the date?

A    August 23, 2021.

MR. DUGAN:  And if we can just go through, go to the next page.

Q    And do you recognize what this is?

A    Yes.

Q    What is it?

A    It's the introduction, my background, the search

Jensen - Direct - Dugan                  53

warrant, the premises, the application.

Q    Is it the beginning of a search warrant application?

A    Correct.

Q    And to be clear, it's the search warrant application for what, to search what?

A    The subject premises.

Q    And it's your name there, Elizabeth Jensen?

A    Yes.

Q    And if we could look at paragraph three.

     Do you see what paragraph three says?

A    I do.

Q    What does paragraph three say?

A    This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter.

Q    And was that true?

A    Yes.

     MR. DUGAN:  And if we could skip ahead to paragraph 32 on page 13.

Q    Do you see the heading, the 1304 phone and the subject premises?

A    I do.

Q    And paragraph 32, what does that say?

A    It says:  Based on my training and experience and my participation in the investigation, I submit that there is

Jensen - Direct - Dugan                54

probable cause to believe that Alex Ricaurte Cruz is the user of the 1304 phone, that Cruz resides at the subject premises, and that fruits, evidence, or instrumentalities of the subject offenses may be found at the subject premises.

Q    Did you believe that statement to be true at the time?

A    Yes.

Q    Do you believe that statement to be true now?

A    Yes.

MR. DUGAN:  Can we look now at paragraph 33.

Q    Can you read paragraph 33 for us, please?

A    Sure.

Specifically, based on my review of records provided by Uber Technologies, Inc., Uber, I'm aware that the Uber account associated with the 1304 phone belongs to Alex Ricaurte, who I understand to be Alex Ricaurte Cruz and lists an e-mail address of the AFRCruz527@gmail.com.  Based on my training and experience, I understand the letters "AFR Cruz" to be a reference to Cruz's full name, Alex F. Ricaurte Cruz, and I understand the numbers "527" to be a reference to Cruz's date of birth, May 27, 1975.

Based on my review of law enforcement databases, I'm aware that Alex Ricaurte Cruz resides at the subject premises.

Q    And did you believe all that to be true at the time you swore out this search warrant application?

Jensen - Direct - Dugan                                55

A      Yes.

Q      Do you believe all that to be true now?

A      Yes.

Q      And then the next paragraph, please.

A      In addition, based on information provided by the New York City Department of Social Services, DSS, I'm aware that DSS records for Alex Ricaurte list the telephone number for the 1304 phone and the address for the subject premises.

Q      Did you believe that to be true at the time?

A      Yes.

Q      Do you believe that to be true now?

A      Yes.

Q      And then paragraph 35.

A      Further, based on my review of subscriber information provided by T-Mobile, I'm aware that the 1304 phone is associated with a William Quinonez at the subject premises. Based on my participation in the investigation, including my review of law enforcement databases and open source social media records, I'm aware that William Quinonez' associates with and lives at the subject premises with Cruz.

Q      And did you believe all that to be true at the time?

A      Yes.

Q      Did you believe that to be complete and accurate at the time?

A      Yes.

Jensen - Direct - Dugan                56

Q    Did you believe anything about that to be misleading at the time?

A    No.

Q    Do you believe any of that to be misleading now?

A    No.

        MR. DUGAN:  Let's look, now, at -- well, before we do that.

Q    Did you explicitly include information about the DD-5 in this search warrant application?

A    No.

Q    Did you reference the DD-5 in this search warrant application?

A    No.

Q    Why not?

A    Because it didn't tell me more than what I knew.

Q    And what was that?

A    That the telephone number associated with William Quinonez.

Q    And did you include all of the information in this search warrant application about the information you had that the defendant was the user of the 1304 phone?

A    No.

Q    We went through the DOE correspondence that you had a minute ago with the Court, right?

A    That's correct.

Jensen - Direct - Dugan                     57

Q    Did you include that information?

A    No.

Q    Why not?

A    Because I didn't put all the information in.

Q    But why not that information?  Why not add it?

A    Because probable cause, I put what I -- I didn't think I had to put all my information in.

Q    You used the term in the search warrant, you used "associated with."

A    Mm-hm.

Q    Why did you use the term, "associated with"?

A    Because the records, the T-Mobile that I was swearing to, if you -- if you read the interpreting subscriber information, they use the word "associated."

Q    And that's how you came up with the term?

A    Yeah, yeah.  I was keeping it consistent.

Q    Did you include the fact that the T-Mobile return only showed the 1304 number as is secondary contact for William Quinonez in the search warrant application?

A    No, I didn't indicate that the 1304 was a secondary contact.

Q    Why not?

A    I didn't include all my information.

Q    Do you think it said anything more or less than what you had already included?

Jensen - Direct - Dugan                          58

A     No.

MR. DUGAN:  If we could go to page 27 of this document.

Q     And you see there is a signature line?

A     That's correct.

Q     Is that your signature?

A     Yes.

Q     And did you sign this document?

A     Yes.

Q     Did you sign this document because you believed it to be true?

A     Yes.

MR. DUGAN:  Now I want to look at attachment B to the warrant.  And specifically, I want to go to paragraph 18.

(Exhibit published.)

MR. DUGAN:  And maybe we can zoom in on paragraph 18.

Q     Would you mind reading it for us?

A     Oh, sure.

Because other people may share the subject premises as a residence, it is possible that the subject premises will contain storage media that are predominantly used and perhaps owned by persons who are not suspected of a crime.  Law enforcement personnel will seize computers,

Jensen - Direct - Dugan                           59

cellular devices, or electronic storage media that law enforcement personnel reasonably believe, based on location of such devices within the subject premises, any identifying information on the exterior of such devices, and any other information about such devices available to law enforcement personnel that either are or have previously been used by, whether directly or indirectly, one or more individuals who are suspected to have committed the subject offenses, or that may otherwise contain any electronically stored information falling from the categories set forth in attachment B.

Q    I want to ask you a couple of questions about this.

Do you understand that this paragraph is among the paragraphs that would have authorized you to seize electronic devices from the subject premises?

A    That's correct.

Q    And in this paragraph, does this paragraph in attachment B authorize you to at least potentially seize devices from more than one person?

A    That's correct.

Q    And where does it authorize you to do that?

The third line from the bottom, sorry.

A    Yeah, you're good.

That either are or have previously been used by, whether directly or indirectly, one or more individuals who

Jensen - Direct - Dugan                    60

are suspected to have committed the subject offenses.

Q    Now, did you believe at the time you submitted this that William Quinonez was the user of the 1304 phone?

A    No.

Q    If you had believed that, would you have included information, additional information about him being associated with the phone?

A    Yes.  But if I believe that, the search warrant would likely look different.  But yes, I would have included him.

Q    At least insofar as this paragraph is concerned, if you had included information that showed more than one person could have been using the device, would that have strengthened or weakened the probable cause to search and seize devices from more than one person?

A    That would have strengthened it.

Q    Thank you.

        We mentioned that this was not signed by the Magistrate Judge.

        MR. DUGAN:  If we could now look at what's been marked as 3500-36.

        And Your Honor, I will continue to be mindful about what we're discussing here.

        (Exhibit published.)

Q    Do you recognize what this is?

A    Yes.

Q    And is this a cover page to a search warrant application?

A    Correct.

Q    And is this one signed by the Magistrate Judge?

A    No.

Q    And look at the first page again so we know what we're looking at.

A    Yes.

        MR. DUGAN:  Sorry, can we look at the next page?

Q    Still the introductory language of the same search warrant?

A    That's correct, yes.

Q    And just for efficiency's sake, fair to say that you have reviewed these documents before Court today?

A    Yes.

Q    You are aware of what the changes are in these documents --

A    Yes.

Q    -- that we're discussing?

A    Yes.

        MR. DUGAN:  So if we could look at, go to what is in this version, paragraph -- go to paragraph 13.  Excuse me, page 13, paragraph 32.

        THE WITNESS:  Read?

        MR. DUGAN:  No, we don't have to read it all

again, but I want to direct you to the next page which is paragraph 36. And if you want to read it all again now, you can, but you don't have to.

Q   Are paragraphs 32, 33, 34, 35, the same in all material respects as we just went over?

A   That's correct.

Q   Okay. And what about paragraph 36?

A   That's different.

Q   Okay. Can you read what paragraph 36 says?

A   Sure.

Based on my participation in the investigation, including my review of law enforcement databases and open source social media records, I believe approximately seven individuals reside at the subject premises:  Cruz; Cruz's two sons, approximately ages 18 and 21; a woman who I believe to be Cruz's mother, approximately age 80; a woman who I believe to be Cruz's sister; Quinonez, who I believe to be Cruz's brother; and a woman who I believe to be Quinonez's partner.

Q   You added this paragraph to the warrant?

A   That's correct.

Q   Or who added the paragraph to the warrant?

A   The AUSA.

Q   But you were aware that this paragraph was being added?

A   Correct.

Jensen - Direct - Dugan                    63

Q   Did you sign that you agreed that this paragraph was true?

A   Correct, yeah.

Q   Was this paragraph true?

A   To my knowledge, yes.

Q   Do you still believe it to be true?

A   Yes.

Q   Do you know why this paragraph was added and why you signed off on it?

A   My understanding was other people were in the residence and we were protecting the other people that didn't commit a crime from intrusion having their devices taken.

        MR. DUGAN:  And if we can go to -- well, just to close the loop on that part, if we could look at page 27.

Q   Once again, is that your signature on this document?

A   That's correct.

Q   Swearing that this is true and accurate?

A   Yes.

Q   And if we could look now at attachment B, paragraph 18.

A   Do you want me to read it?

Q   Yes, please.

A   Because other people may share the subject premises as a residence, it is possible that the subject premises will contain storage media that are predominantly used and perhaps owned by persons who are not suspected of a crime.

Jensen - Direct - Dugan                    64

Law enforcement personnel will seize computers, cellular devices, or electronic storage media that law enforcement personnel reasonably believe that either are or have previously been used by, whether directly or indirectly, the user of the cellular telephone assigned call number 718-296-1304.  The 1304 phone, who is believed to be Alex Ricaurte Cruz or that may otherwise contain any electronically stored information falling in the category set forth in attachment B.  Specifically, an electronic device --

THE COURT:  Just to save time, I'm pretty familiar with this paragraph, so I think we can probably not have her read it all into the record.  As long as this is just to confirm my understanding that this is the paragraph that was in the final attachment B that was submitted.

MR. DUGAN:  It's actually an intermediate paragraph.

THE COURT:  Okay.

MR. DUGAN:  The final attachment B has an -- we can adduce had one additional sentence.  But in the interest of time --

THE COURT:  Yes.

Q    Agent Jensen, do you understand that this reflected a change to attachment B?

A    I do.

Jensen - Direct - Dugan                                    65

Q    And what was the change, in sum and substance, what was the change?

A    So it has us saying that we can take the items belonging to the user of the 1304 and then if the items not otherwise appear to individuals who is not the users of the 1304 known, so basically like if there were two phones on Ricaurte's dresser and someone else used the one phone, we wouldn't take that phone.

Q    If someone else said that they used that phone, you wouldn't take it?

A    Exactly, yes.

Q    And it says in this paragraph, the user of the 1304 phone who was believed to be Alex Ricaurte Cruz.

     Do you see that?

A    I do.

Q    Is that true?  Was that true when you signed off on this warrant, was that true?

A    That's correct.

Q    And was there anything incomplete or misleading about that statement?

A    No.

Q    Based on the information you provided in the warrant?

A    No.

          MR. DUGAN:  Can we look now at Government Exhibit 1.

Jensen - Direct - Dugan                    66

(Exhibit published.)

MR. DUGAN:  And we can just skip to attachment B of Government Exhibit 1.  And we can skip through the reading of 18 and just go to the last sentence of 18.

THE COURT:  Zoom in on that.

MR. DUGAN:  Oh, sorry.

THE COURT:  Thanks.

Q    And the last sentence of 18?

A    Do I read it?

Q    Please, yes.  Just the last sentence?

A    If law enforcement officers determine that an individual other than Alex Ricaurte Cruz is the user of the 1304 phone, law enforcement officers will seize the devices belonging to the user of the 1304 phone and will apply for an additional search warrant prior to searching those devices.

Q    What was your understanding of why this sentence that you subscribed to was added?

A    First, there's other people, and it was protecting them.

But if, in fact, we were wrong, we still knew that a crime was being committed and we can't leave, like, child pornography or CSAM at a residence.

Q    And what did you understand you were authorized to do if you learned when you were in the home that Alex Ricaurte

Jensen - Direct - Dugan                          67

Cruz was not the user?

A    If not, then we could take those devices, but then apply for an additional search warrant.

Q    And what did you understand you could --

MR. DUGAN:  Strike that.  Withdrawn.

We can put this away.

Q    Now I want to move on and talk to you a bit about any work you did to learn about or understand what we've been describing as the subject premises.

THE COURT:  You know what, why don't we take a break before you do that?  I think it's a good time for a morning break.  So let's come back in five to seven minutes or so.

And you are welcome to go to the restroom, stretch your legs, and we'll resume.  You are just on the witness stand now, so you can't discuss your testimony with the Government's lawyers or anyone else.

And I will see you shortly.

MR. DUGAN:  Thank you, Your Honor.

THE COURT:  Thank you.

(Recess taken.)

(In open court.)

THE COURT:  Mr. Dugan, whenever you are ready to proceed.

MR. DUGAN:  Thank you, Your Honor.

Jensen - Direct - Dugan                    68

BY MR. DUGAN:

Q    Before we broke, Agent Jensen, we were about to start discussing any work you did to identify or any diligence you did surrounding the subject premises.

A    Okay.

Q    Just to start off, how did you identify the subject premises?

     I think you've gone over this, but just to work chronologically, how did you identify what ultimately became the subject premises here?

A    The telephone number associated with that address, open source information, that was in the records.

Q    And after you identified information that led you to believe that Alex Ricaurte Cruz was likely the user of the subject device, did you then take steps to show that he was at the subject premises?

A    Yes.

     There was physical surveillance done not just by me, but also by Detective Harkins on multiple occasions.  We checked different records.  And I went out there, too.

Q    You spoke about surveillance and you said you personally conducted physical surveillance of the premises?

A    That's correct.

Q    How many times?

A    Twice.

Jensen - Direct - Dugan                    69

Q    And can you talk a little about what goes in physical surveillance of a premises?

A    Sure.

So depending on location, we want to see what the premise looks like, what identifying factors.  We look, mailboxes, doorbells, doors, what's around it, people coming in and out, other items on the location.  Anything around that premise, we try to observe.

Q    What's the point of doing that?

A    So we have an understanding of the location and be able to ascertain what kind of residence it is and what kind of building.

MR. DUGAN:  Let's look at a couple of things.

Can we pull up, please, what's been marked as GX-2?

(Exhibit published.)

Q    Are you able to see that on your screen?

A    Yes, I can see it.

Q    What is GX-2?

A    This is documenting a physical surveillance that was conducted on July 13, 2021.  And it's describing the subject premises.

Q    And what, if anything, do you think is relevant --

I'm sorry, who wrote this?

A    The agent that I was working with.

Jensen - Direct - Dugan                    70

Q    And is your name on it, as well?

A    Yeah.  So I was like a co-signer.  So he wrote it, but I also signed it.

Q    And maybe you could read the paragraph beginning, the subject premises, please?

A    Sure.

     The subject premises is a three-story residence with light siding.  There is a white gated fence partially surrounding the walkway to the main entrance.  There is a black railing leading up to the stairs to the main entrance. The main entrance is a white door.  To the left of the main entrance is black and silver numbering -- I'm sorry, in black and silver numbering are the numbers 78-11.  There is a surveillance camera to the left of the main entrance. Posted on the house and door to the rear of the house are signs which state:  Warning.  And the use of security cameras.

Q    And then the next paragraph, please?

A    Sure.

     There is an attached double-door garage to the left of the residence.  Parked in front of the house is a Toyota Sienna bearing New York license plate HPW 9272.  This vehicle is registered to a William J. Quinonez, DOB --

Q    You don't have to read the date of birth.

A    Oh, sorry.  At 78-11 87th Road, Queens, New York,

Jensen - Direct - Dugan                    71

11421.

Q   And I want to come back to the issue of the garage in a second, but just to clarify one thing upfront, did you determine whether the garage was part of the subject premises?

A   We did.

Q   And was it or was it not?

A   It was not.

Q   Are you familiar with different types of buildings and residences from your training and experience in New York City?

A   Yes.

Q   Are there single-family and multi-family buildings?

A   That's correct.

Q   Based on what's described in this report, what did you believe the building was most -- the subject premises was most consistent with?  What type of building?

A   A single-family.

Q   Pardon me?

A   A single-family.

Q   And why is that?

A   There was one main door.  There was one mailbox.  There was -- well, not here, but there's one meter.

Q   Nothing in there -- so --

A   Nothing in there signaled it wasn't.

Jensen - Direct - Dugan                              72

Q    What would be some types of things you would be looking for in your surveillance to see or to determine whether a building is a multi-family residence or a subdivided residence?

A    Well, if there's different meters, if there's multiple mailboxes, if there's like doorbells or multiple doors.

Q    And you've said the main entrance there.

Was there another entrance to the house that you saw in the course of your surveillance?

A    No.

Q    So what were you referring -- why did you call it the main entrance?

A    Well, that's where the mailbox was and -- like, that's where you go into the house.

Q    And did you see anything else in this surveillance that could have been an entrance?

A    Not an entrance, but what's depicted here is, to the rear of the house or posted on the house and door, to the rear of the house, so there was just a door between the house and the garage that had the warning signs, but no other door that led into the residence.

Q    We'll look at a picture in a second which might help clarify this, but to be clear, that door was not something that was connected to the house that you observed or that you were describing there, or you were referencing there?

Jensen - Direct - Dugan                      73

A     Correct.  No, you're good.  Yeah.

          MR. DUGAN:  If we could look at Government Exhibit 2 C, please.

          (Exhibit published.)

Q     And Agent Jensen, what is Government Exhibit 2 C?

A     That's a front view photo I took of the subject premises.

Q     And anything notable to you there in terms of determining whether there was a single or multifamily home?

A     Well, just one mailbox.  Just the numbers.

Q     Is there anything on the door, for example, that would have suggested there was more than one unit?

A     No.

Q     And you've said one mailbox?

A     Correct.

Q     And this is the one door you saw on the house?

A     Yes.  That's what we described as the main entrance.

          MR. DUGAN:  And then if we could look at 2 D.

          (Exhibit published.)

Q     What is this?

A     Yes, that's what I was trying to describe before.  You have your main house.  You have that detached garage that we described.  But in between, you have a door that leads between the house and the garage and they're connected.

Q     And that was the other door that you noticed?

Jensen - Direct - Dugan                    74

A    Yes.  It also has the warning signs on it.

Q    And what type of work did you do to establish whether the garage was part of the subject premises?

A    We then contacted New York Department of Buildings to then get records for this location -- this location and then the neighboring location in order to see where that garage sits.

Q    Why did you do that?  Why did you look into the garage?

A    Because we didn't know if that was part of the residence.

Q    And because you didn't know, what did you do?

A    So we took different steps to kind of -- or, not kind of, to ascertain where that garage was.

Q    Were you comfortable not knowing whether the garage was part of the subject premises?

A    No.

Q    Why not?

A    Because I'm swearing to a document that I want to be truthful and know the facts.

Q    You mentioned, did you say that to determine the owner of the garage, you went to the Department of Buildings or looked at records from the Department of Buildings?

A    Yes.

      MR. DUGAN:  Could we please pull up Government Exhibit 3 A.

(Exhibit published.)

Q    And Agent Jensen, do you recognize this?

A    I do.

Q    What is this?

A    This is the information we received from the New York City Department of Buildings.

Q    And what is relevant about this document to you in terms of the subject premises, in terms of describing the subject premises?

A    Well, I mean, it has the lot number, so we can look at the graph.  It has buildings on the lot, that's one.  It has multi-dwellings, no.  It has the classification for A5-1 family dwelling.  It has the owner.  It has the address.  So it has --

Q    So to break it down, the address here, does it list anywhere here, I guess on the top left, 78-11S 87th Road, do you see that?

A    I do.

Q    Does it list multiple units or say anything about multiple units?

A    No.

Q    And then you mentioned HPD multiple dwelling, and that's kind of the last bold entry on the left side or in the left hand column.

Do you see that?

Jensen - Direct - Dugan                    76

A    I do.

Q    And what is the description next to HPD multiple dwelling?

A    It says no.

Q    And then I think you mentioned one-family dwelling and I think that's in --

A    The middle.

Q    -- the middle of the page under Department of Finance building classification.

And what does it say there?

A    A5-1 family dwelling.

Q    And did you immediately know what that meant?

A    No.

Q    A5-1 family dwelling?

A    No.

Q    Did you take steps to try to understand more about what that meant?

A    Correct.

Q    How did you do that?

A    We looked it up.  My -- the detective that got this, he talked to others.  We determined it was a one-family dwelling to understand that.

Q    And under DOF owner information, there is a name.

Who is the name?

A    William Quinonez.

Jensen - Direct - Dugan                    77

Q    Does it have any other names?

A    No.

Q    Then I want to look at the next page of the document.

What is this?

A    So this is that other lot, lot 30, that we ascertained in order to understand if the garage was on the subject premise lot or on a different lot.

Q    And what did you determine from looking at this?

A    So based on this document, there's -- it says buildings on lot, two.  And then keep going.

Q    Please.  Sorry.

A    No, I'm sorry.

B2-2 family.

THE COURT:  Can you just zoom in on whatever you are -- I think for the witness and for me, it would be helpful to see it a little closer up.

MR. DUGAN:  I guess we could start with the Department of Finance Building Classification in the middle.

THE WITNESS:  Perfect.

Q    And so what does that say about this lot?

A    It's B2-2 family dwelling.

Q    And what did you understand that to mean?

A    A family dwelling, family, multi-unit.

Q    And this was for the lot next door to the subject premises?

Jensen - Direct - Dugan                    78

A      Yeah.

Q      And that was clearly described as a two-family dwelling?

A      Correct.

Q      Subject premises clearly described as a one-family dwelling?

A      Correct.

Q      And in terms of -- and I guess we can also just go to the last page of this document, to skip ahead, in the interest of time.

        MR. DUGAN:  One more, please.

Q      Looking at this document and looking at the document that we just looked at, why is there, on this page, a notation about garage?

A      Because that was what we were unsure of.  And so we can see that the garage sits on lot 30.  And the subject premise was lot 29.

Q      So you were unsure from your surveillance about whether the garage was part of the subject premises or not.  You undertook this investigation as part of your efforts to understand that and determined that it wasn't, in fact, part of the subject premises?

A      Mm-hm, that's correct.

        MR. DUGAN:  Could we look at Government Exhibit 3, please.

(Exhibit published.)

Q    And do you recognize what this is, Agent Jensen?

A    Yes.  This is a 302 written by my partner, Detective Harkins.

Q    And what is the relevance or significance of this 302?

A    So here, he had contacted -- well, it talks about the Department of Building records and then it also talks about the results of contacting Con Edison utility provider account which lists just William Quinonez's account activated on 12/28/01, a contact phone, e-mail.  And then Con Ed records reflect the one meter, one account active status.

Q    And did Detective Harkins share this information with you as part of the investigation?

A    Yes.

Q    Why did Detective Harkins obtain this information? What was the relevance of it?

A    Because, like I said, we were trying to figure out what lot that garage was on.  And it also shows that he went out and observed the location as well.  And he also observed one electric meter, affixed to the west side of the structure. And then he also has a photo attached.

Q    And what's the relevance of that, from your perspective?

A    Again, one account -- or one meter, one account,

Jensen - Direct - Dugan                    80

reflective of the one family.

Q    And just to note for the record, what is the contact phone number listed under William Quinonez listed on this document?

A    On this one it's 718-752-4441.

Q    And that is not the 1304 number, right?

A    That's correct.

        MR. DUGAN:  We can take this down, please.

        Can we also pull up now what has been marked as 3500-2?

        (Exhibit published.)

        MR. DUGAN:  No, sorry.  That's not the one.

        Sorry, 3500-3.  We already looked at -2.

        (Exhibit published.)

Q    And Agent Jensen, what is this document that we are looking at, at 3500-2?

A    So as part of my training, we contact, like I said earlier, postal and ACS.  And this is when I contacted our postal contact and he provides -- so I ask him can you let me know who receives mail at the 78-11 87th Road, Woodhaven, New York, and he responds the names are Jacqueline-Quino and Alex Ricaurte.

Q    And what was the significance of this as part of your investigation in the subject premises?

A    That Alex Ricaurte was receiving mail at this address

Jensen - Direct - Dugan                    81

in addition to this other person.

Q    Now, in the course of your investigations, is it common for you to reach out to postal to determine who is receiving mail at a specific address?

A    Yes.

Q    In your experience, if a building has multiple units, would that be reflected in information you receive from the post office?

A    Yeah, I've worked with him before and he'll denote.

Q    It's Inspector Gelpi?

A    Yeah.  And he'll denote if it's murky or if it's a different apartment or if it's not clear, he'll indicate that.  And when I give him the address, he provides who is receiving mail.

Q    And any indication from this to you that there are multiple units in this apartment or, excuse me, in this building?

A    No.

Q    In the course of your investigation, did you see any indication at all that the subject premises was subdivided or was a multifamily building?

A    No.

Q    Do you know, sitting here today, what ACRIS is?

A    Well, before knowing about this hearing, I did not. And then knowing about this hearing, I have been informed

Jensen - Direct - Dugan                    82

about it.  But no.

Q    So before preparing for today's hearing --

A    Correct.

Q    -- you did not know what ACRIS was?

A    That's correct.

Q    Have you ever looked up any records on ACRIS before?

A    No.

Q    Were you ever told that that was something you should do as part of your investigation to a subject premises?

A    No.

Q    What were the steps that you understand you should do as part of your surveillance and diligence around a subject premises?

A    Like I said, about postal, ACS, Con Ed, Buildings, understanding who's in the house, record checks, descriptions, going out there, seeing it, describing it.

Q    You mentioned understanding who is in the house.  And we went over this when we were looking at the warrant before, but did you have an understanding of who was living in the home prior to swearing out the search warrant in this case?

A    Yes.

Q    And what, if anything, did you understand about the relationship between the people in the home?

A    They were family, extended family members.

Jensen - Direct - Dugan                    83

Q    Was there anything that you were taught to do as part of your training into the surveillance or diligence of a subject premises that you failed to do here?

A    No.

Q    And in the course of that, was there anything that you saw that made you believe that this could have been a subdivided or multifamily residence?

A    No.

MR. DUGAN:  We can take this down.

Q    Agent Jensen.

A    Yes.

Q    Was everything you swore to in the three drafts of the warrant we've gone over true?

A    Yes.

Q    Do you believe all of the information that you included sitting here today was true?

A    Yes.

Q    Did you withhold any information that you thought was material to that warrant application?

A    No.

Q    When you swore out the warrant, did you entertain any doubt at all as to the truth of any of the statements you made in that application?

A    No.

MR. DUGAN:  Nothing further, Your Honor.

Proceedings                          84

THE COURT:  Okay.  Thanks very much.

So let's do this.  I do need to take a lunch break and I think we might as well take it now before we get into the cross-examination.  I've got a couple of things I need to take care of at the break.

So why don't we come back in about 40 minutes.  So around, let's get started at 1:20, and I will see you back then.

And, again, you are still on the witness stand so you can't discuss your testimony with anyone, but you can discuss lunches, logistics or the weather with the Government or anyone else.

(Witness steps down.)

THE COURT:  Thank you.

See you back soon.

(Luncheon recess taken.)

**A F T E R N O O N   S E S S I O N**

(In open court.)

(Witness resumes the stand.)

THE COURT:  We're back on the record.

Whenever you're ready, Ms. Hirozawa.

MS. HIROZAWA:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MS. HIROZAWA:

Q    Agent Jensen, I just wanted to circle back to the T-Mobile records that we were talking about on direct.

You testified on direct that there were two contact numbers listed.

A    That's correct.

Q    That were both subscribed to William Quinonez.

A    Correct.

Q    And you described what's listed as Contact 1 as the primary number?

A    Correct.

Q    That's your assessment based on your training and experience; not something that T-Mobile characterized the number as?

A    Correct.

Q    And then there's a second contact number, Contact 2?

A    Mm-hm.

Q    And you characterized that as a secondary number that,

Jensen - Cross - Hirozawa                    86

based on your training and experience, is often used by a different person?

A     Can you pull it up?

Q     Sure.

          MS. HIROZAWA:  Can you pull up Government Exhibit 6, please?

          (Pause in proceedings.)

          MS. HIROZAWA:  It should be an Excel spreadsheet.

          You can make it full screen.

          (Exhibit published.)

          MS. HIROZAWA:  And if you could scroll down --

up -- perfect -- no, down a little.

Q     So Agent Jensen, the T-Mobile records that you received list the two numbers as Contact 1 and Contact 2.

A     That's correct.

Q     The records from T-Mobile do not include a username for either of those numbers.

A     That's correct.

Q     They don't characterize the numbers.

A     That's correct.

Q     They don't state that one is primary, one is secondary.

A     Correct.

Q     And they don't state whether it is a home phone number?

A     No.

Q     A cellphone number?

A    That's correct.

Q    And you testified that, in your experience, it's common for the second number to be used by a different person in the household?

A    Often other numbers that come back with T-Mobile could be used with other people, yes.

Q    But it's also possible for one person to have multiple numbers?

A    That's correct.

Q    For example, a home phone number and a cellphone number?

A    Yes.

Q    Now, you also searched other databases as part of your investigation.

A    That's correct.

Q    Including, I believe you testified on direct, the NYPD Domain Awareness System, DAS.

A    That's correct.

        MS. HIROZAWA:  Could we pull up Defense Exhibit T?

        (Exhibit published.)

Q    And while we are waiting for that, the DAS records that you searched included prior contacts involving William Quinonez and the NYPD.

A    Correct.

        MS. HIROZAWA:  If you could scroll up to the top

of page 1 first.

Q    I'm not sure if you can see the top on your screen, Agent Jensen.  I think it's cut off on the projector screen.

A    Does it say the Omni Form System?

Q    Yes.

Do you recognize this as a form within the NYPD's Domain Awareness System?

A    I do, yeah.

Q    And do you recognize the name of the individual involved in this?

MS. HIROZAWA:  We may have to scroll to the bottom.

A    The victim?  Is that where?

MS. HIROZAWA:  If you could zoom in on the bottom, please.

A    Oh, yes.  William J. Quinonez.

Q    Thank you.

And is it fair to say that this document is related to a fender-bender that took place in 2002.

A    Sorry, it's like blurry up here.

MS. HIROZAWA:  If you could zoom in on the narrative.

A    I see the 2002 -- oh, there it is.

That's correct.

MS. HIROZAWA:  And if we could go to page 2 of

Defense Exhibit T.  And you could zoom in on the information there.

Q    Can you please read to me the phone numbers that are listed?

A    It's 718-296-1304.  And then the cell is 917-459-6022. And then the business is 212-274-4777.

Q    Do you recognize any of those phone numbers?

A    I have -- well, the 1304 number.

Q    Yes.  And just to make sure the record is clear, that number was listed here as a home phone number?

A    That's correct.

Q    And do you recognize the address listed here?

A    I do.

Q    What is that address?

A    78-11 87th Road, Queens, New York, 11421.

Q    Thank you.

     And this is information that was provided to the NYPD by William Quinonez?

A    That's correct.

     MS. HIROZAWA:  If we could go to page 3 of Defense Exhibit T.

     And if you could scroll down a little bit more and zoom in on the narrative and victim information.

Q    Is it fair to say that the victim of this incident, another traffic incident in 2010, was also William Quinonez?

A    That's correct.

        MS. HIROZAWA:  You can take that down and go to page 4.

Q    Could you read for me the conduct information that is listed here?

        MS. HIROZAWA:  You can zoom in.

A    Yes.  It's the 1304 number.

Q    And how is that characterized by Mr. Quinonez to the NYPD?

A    Cellphone -- or cell, sorry.

Q    Thank you.

        So I wanted to just ask you about some other steps that you took in your investigation.

        You mentioned that you started with the phone number, the 1304 phone number?

A    That was -- yes -- sent to us pretty early on.

Q    And that was communicated to you by your counterpart in Illinois --

A    Correct.

Q    -- because the mother of one of the minor victims had reported that her father was communicating with that phone number?

A    That's correct.

Q    And the mother had also done her own investigation and identified William Quinonez in New York as the potential

perpetrator?

A    That's correct.

Q    And at that point, you and your counterpart in Illinois were investigating William Quinonez as the suspect in this case?

A    No.

     At that point when he had asked for, like, information, I did some checks and so did my partner, Detective Harkins, and we, like, did our -- some steps.  And I communicated with him that there's other possibilities, other people in the house.

Q    Okay.  Is it fair to say that your counterpart in Illinois viewed William Quinonez as the primary suspect at that juncture?

     MR. DUGAN:  Objection.

     THE COURT:  To the extent it was conveyed to you, did he tell your counterpart in Illinois who he viewed as the primary suspect or who she viewed as the primary suspect at that point?

     THE WITNESS:  He may have.

Q    Would it be helpful for you to review your communications with him?

A    Sure.

     MS. HIROZAWA:  If you could pull up 3500-EJ-1.

     (Exhibit published.)

MS. HIROZAWA:  And if you could go to page 2, please.

A    Based on -- do I answer?

Q    Sure.

A    Based on this e-mail, it sounds like he said:  Further checks conducted by the FBI.  Agree with the mother's findings that Quinonez is located.  The New York AOR.

Q    And he also indicated that after speaking with the AUSA in his district, she believed that with a bit of surveillance to confirm the address was good and that the subject, William Quinonez, resided there, they had enough PC for a residential search of his residence?

A    Correct.

Q    So is it fair to say at that juncture he believed that William Quinonez was the primary suspect in this case?

A    That's what it sounds like, yes.

Q    And at that juncture, did you have any information to contradict that?

A    Can you show me the date?

Q    Of course.

MS. HIROZAWA:  If you could zoom out.

A    So that's what he sent.  And then I think I respond with asking for the address and telephone.  And then -- yeah, perfect -- and then I send e-mails to postal and ACS that returns different information.

Jensen - Cross - Hirozawa                    93

Q     And I want to talk a little bit about that.

So you contacted your contact at USPS?

A     Yeah.

Q     And requested information regarding anyone that receives mail at that address?

A     Correct.

Q     And at that point, you were aware that William Quinonez was the owner of 78-11 87th Road?

A     I'm not sure if I knew he was the owner at that time.

Q     Okay.  You knew he was associated with that address?

A     Yes.

Q     You knew that the T-Mobile records were subscribed to that address?

A     Yes.

Q     And you knew that the FBI in Illinois had conducted their own record checks and determined that William Quinonez was associated with that address?

A     That's correct.

Q     Were you surprised that no records came back from USPS indicating that he received mail there?

A     I took what he told me and -- and thought about it. And having other people at the house gave me more information about who was there.

Q     And the USPS response indicated that two people received mail at the house?

Jensen - Cross - Hirozawa                94

A    Correct.

Q    Based on your investigation, it sounded like at least seven people lived at the house?

A    We believed likely that seven people were at the house.

Q    And two of those people may have been minors or younger, but the other individuals you believed to be adults?

A    Yes.

Q    Now, I want to discuss the Department of Social Services information that you received.

Just to be clear, you did not personally contact the Department of Social Services?

A    I did not.

Q    And you did not personally review or receive any records from the Department of Social Services?

A    That's correct.

Q    Your colleague contacted the Department of Social Services.

A    That's correct.

Q    And orally relayed information they received to you.

A    I don't remember.  We sit very close, like -- well, not now, but then, our desks were right across.  So he could have told me, he could -- I don't remember how the information was communicated.  I don't remember.

Q    But he did not send you any records or hand you any

Jensen - Cross - Hirozawa                    95

records from the Department of Social Services?

A    Not that I -- I don't recall.

Q    He didn't send you an e-mail regarding any response from the Department of Social Services?

A    I don't recall.

Q    Okay.

And if he had, you would have produced that information to the Assistant U.S. Attorney?

A    Yeah.  Or I looked for it, yeah.

Q    And you don't know when the 1304 phone number was provided to the Department of Social Services?

A    It would have been in that time frame of, like, the investigation.

Q    What basis do you have for that?

A    I'm sorry, I'm sorry.  I thought you meant when did we call and ask about it.

Q    No.  When was the 1304 phone number provided to the Department of Social Services?

THE COURT:  Can you rephrase that question, just to --

THE WITNESS:  No, I understand.

THE COURT:  I think everyone understands, but for clarity of the record, what you mean by "provided."  By whom and about whom?

Q    So you don't know who provided that phone number to the

Jensen - Cross - Hirozawa                    96

Department of Social Services?

A     I don't.

Q     You don't know what the context was for that number being provided to the Department of Social Services?

A     I don't.

Q     And you don't know when that number was provided and associated with Mr. Cruz to the Department of Social Services?

A     I don't.

Q     Now, as an FBI agent, you are trained in a number of investigative methods.

       Are you familiar with cell site location information?

A     Yes.

Q     Have you sought a search warrant for cell site location information?

A     Yes.

Q     You mentioned that in this case, you filed a number of subpoenas, search warrants, grand jury subpoenas, to identify the user of the 1304 phone number.

A     I was talking broadly about the case in general.

Q     Did any of those include search warrants for cell site location data?

A     No.

Q     And this may sound silly, but did you try calling the

1304 phone number?

A     No, I did not.

Q     Now, you are also familiar with the Department of Motor Vehicles?

A     I am.

Q     Unfortunately, I'm sure.

      So you're familiar that the DMV also gathers records from any individuals who have a driver's license in New York State.

A     They do.

Q     Have you ever conducted DMV searches as part of your investigations before?

A     Have I personally?  Not that I recall.

Q     Have you ever been involved in investigations where DMV searches are conducted?

A     Yes.

Q     DMV abstract would include a person's name?

A     Yes.

Q     Their date of birth?

A     That's correct.

Q     Biometric information?

A     That's correct.

Q     And their address?

A     That's correct.

      MS. HIROZAWA:  Could we pull up Defense Exhibit Q,

Jensen - Cross - Hirozawa                98

please.

(Exhibit published.)

MS. HIROZAWA:  And if you could zoom in -- if you could scroll down to the bottom.  And zoom in on the mailing address information.

Q    Could you read to me the address listed and the field that says "from"?

A    Sure.  From 10/24/2014.  And the address, 78-11 87th Road, BSMT, Woodhaven, New York, 11421-181.

Q    And what do the letters "BSMT" indicate to you?

A    Basement.

Q    Had you seen this information, would that have impacted your investigation at all?

A    It might have.

Q    How would it have impacted your investigation?

A    Well, I would have taken that information and asked the team how does this impact us.

Q    Would it have impacted the area that you requested to search in the search warrant application?

A    That would have -- I would have talked, if I had seen this, I would have asked the AUSA and asked her how this impacts.  I don't -- I'm not a lawyer.

Q    At the time that you applied for the search warrant application, I think you mentioned that you did not view William Quinonez as a suspect at that point?

Jensen - Cross - Hirozawa                              99

A    I -- I didn't view him as the user of the phone.

Q    Okay.  So you would not have had any reason to search an area of the home that was only occupied by people other than Mr. Cruz.

A    Well, if the search warrant was for the house, we would have done a protective sweep.

Q    Right, but I suppose to put a finer point on my question:  Would this information have led you to seek a search warrant only for the basement apartment where Mr. Cruz resided?

A    It depends on what the AUSA said and the information that we had.

Q    Assuming all of the other facts remained the same, would this have led you to restrict the scope of your warrant to the basement?

A    I'm not sure.

Q    Okay.  And just for the record, you did not conduct a search of DMV records before submitting the search warrant application in this case?

A    That's correct.

Q    Now, based on your investigation and as reflected in the search warrant application, approximately seven people -- you believed approximately seven people resided at 78-11 87th Road?

A    That's correct.

Jensen - Cross - Hirozawa                    100

Q    Based on the information that you had available to you, you believed that some of those people were related or extended family members?

A    That's correct.

Q    Where did you get that information?

A    We did different Accurint, Clear, social media checks.

Q    And none of those checks were reflected in the warrant application; is that correct?

A    That's correct.

Q    The people that you did identify as residing in the home included Mr. Cruz, his two sons, Nick and William, and William Quinonez?

A    Correct.

Q    Mr. Cruz and his sons share a last name?

A    Correct.

Q    Cruz.

     Mr. Quinonez does not.

A    Wait, what's the question?

Q    Mr. Quinonez has a different last name from Mr. Cruz and his sons.

A    That's correct.

Q    The response you got from USPS also indicated that a Jacqueline Hernandez Quino lived at the address?

A    That's correct.

Q    Who is that?

Jensen - Cross - Hirozawa                    101

A    I don't remember today, sitting here.  We did different checks in social media and we had an idea then and I haven't looked at the document since.

Q    Okay.  But it's fair to say Hernandez Quino is a different last name from both Mr. Cruz and Mr. Quinonez?

A    Well, Quino, we interpret as Quinonez.  And based on what we did back then, social media, I don't really recall what we were thinking then sitting here now.

Q    Now, you mentioned that you conducted physical surveillance in this case as well?

A    That's correct.

Q    And you are trained as an FBI agent to conduct physical surveillance of premises?

A    That's correct.

Q    You are also trained on documenting that surveillance?

A    That's correct.

Q    And memorializing your observations in a report known as a 302?

A    That's correct.

Q    Typically, those observations and the information you memorialize includes the date of the physical surveillance?

A    That's correct.

Q    The time?

A    That's correct.

Q    The location?

Jensen - Cross - Hirozawa                102

A    Well, yeah, what's in the 302, yeah.

Q    The length of the surveillance?

A    It depends on like the surveillance type.

Q    Tell me more about that.

A    Different squads do only surveillance.  And we don't always document how long we're out there.

Q    Okay.

I think you mentioned on direct that you document any people you observe.

A    Sometimes, yeah.

Q    Are there times that you observe people and you don't document that?

A    Unlikely.

Q    You document conduct or movement that you observe, particularly with regard to the subject premises?

A    Yes.  We would have taken notes on that.

Q    And you might document anything else that could inform your investigation, like a license plate you could use as an identifier?

A    That's correct.

Q    And you conduct this physical surveillance because all of that information could inform your investigation?

A    Yes.

Q    And it could inform what you include in a search warrant?

Jensen - Cross - Hirozawa                    103

A     That's correct.

Q     And sometimes you will even knock on a door?

A     On surveillance?

Q     Or when you are investigating information to include in a search warrant.

A     We might do a covert ruse of some nature.

Q     In fact, it's not uncommon for your unit within the FBI to knock on a door, for example, at an address where an IP address traces to and confirm the identity of the person who opens the door?

A     If there's a ruse that we do, yes, we would do that.

Q     So it is not uncommon for your unit to knock on someone's door to confirm their identity before seeking a search warrant?

A     I mean, I don't know -- I don't know how common it is, but it occurs.

Q     Okay.

      Sometimes you'll ask who lives at the residence if someone answers the door.

A     That's correct.

Q     Or speak with the landlord about who resides at the residence.

A     That's correct.

Q     To confirm the unit number of your target.

A     That's correct.

Jensen - Cross - Hirozawa                    104

Q    And all of that is done before getting a search warrant.

A    That's correct.

Q    I think you mentioned on direct that you conducted physical surveillance on two occasions in this case.

A    That's correct.

Q    One of those occasions was July 13, 2021?

A    That's correct.

Q    Do you recall what time that was at?

A    No.

Q    Would it assist you to review your 302 from that day?

A    Sure.  I didn't write it, but yes, that would be helpful.

Q    Okay.

          MS. HIROZAWA:  That would be GX-2.

          (Exhibit published.)

Q    Did the report refresh your recollection?

A    Yes.  Thank you.

          MS. HIROZAWA:  You can take that down.

Q    What time did you conduct physical surveillance?

A    There is no time indicated.

Q    Okay.

          Does the report indicate how long you conducted the physical surveillance for?

A    No.

Jamie Ann Stanton, RMR, CRR, RPR
Official Court Reporter

Q    And that's because your partner did not include that information.

A    We didn't -- yes, we didn't include that.

Q    And you also signed off on the report, correct?

A    I did.

Q    During the time that you were conducting physical surveillance there, you did not observe anyone leave the house?

A    I don't recall.

Q    You didn't observe anyone enter the house?

A    I don't recall.

Q    You didn't observe anyone inside the house?

A    I don't recall.

Q    And you didn't observe Mr. Cruz at the subject premises?

A    I don't recall.

Q    And you don't have anything to refresh your recollection because you didn't document any of those observations in this 302?

A    Yes, that's correct.

Q    Is it fair to say that if you had observed Mr. Cruz at the subject premises, you would have documented that?

A    Yes.

Q    And is it fair to say that people entering or leaving the residence would also have been relevant information to

Jensen - Cross - Hirozawa                106

Q    document in the report?

A    Yes.

Q    Now, you did observe a car registered to William Quinonez parked out front.

A    I did.

Q    You did not observe any car registered to Mr. Cruz near the subject premises.

A    I did not.

Q    Now, based on your investigation, Mr. Cruz did not own the subject residence.

A    Correct.

Q    He wasn't listed on the property deed.

A    Correct.

Q    None of the databases you searched reflected that he owned the property.

A    That's correct.

Q    You didn't observe him inside the property.

A    That's correct.

Q    You didn't observe him in the two upper floors of the property.

A    No.

Q    And you didn't observe him entering or leaving that property at any point.

A    Not that I recall.

Q    What was the second date that you conducted physical

Jensen - Cross - Hirozawa                107

surveillance?

A    I don't remember.

Q    Did you prepare a 302 related to that physical surveillance?

A    I did not.

Q    Why didn't you prepare a 302 related to that physical surveillance?

A    Because I didn't -- I was at the house and didn't see anything other than what we saw.

Q    Is it fair to say that had you seen anyone entering or leaving the house, you would have prepared a 302 documenting that?

A    Likely.

Q    Is it fair to say that if you had observed Mr. Cruz at the premises, you would have documented that?

A    Likely.

Q    Now, you were also working with NYPD detectives on this investigation.

A    My partner?

Q    Detective Harkins?

A    Yes.

Q    And then also there were other NYPD detectives involved, as well.

A    Well, they were involved, but we weren't, like, working with them.

Jensen - Cross - Hirozawa                    108

Q    You weren't officially partners.

A    Yeah, like, we didn't know that they went out there any of the times.

Q    You never knew that they went out there.

A    Well, like, we knew, but, like, they didn't tell us ahead of time of them going out.

Q    Understood.

So Detective Harkins was your primary partner on this investigation?

A    For the most part, yes.

Q    And then just to be clear about the other players involved.  There was Detective Castillo and Detective Jimenez?

A    Correct.  With the NYPD, I forget who they are with.

Q    With the NYPD.

A    Yes.

Q    And they visited the residence --

THE COURT:  I'm sorry, was Harkins also NYPD?

THE WITNESS:  He was NYPD, but with us.

THE COURT:  Meaning detailed to your unit?

THE WITNESS:  Sorry, yes.

TFO Detective Harkins was a Task Force Officer. At this time he was employed for 25 years as a detective and he was with us as a Task Force Officer.

THE COURT:  Got it.  Thank you.

Jensen - Cross - Hirozawa                          109

Q    But you became aware that other NYPD detectives visited 78-11 87th Road on at least two occasions before you got the search warrant.

A    That's correct.

Q    You knew that Detective Castillo and Detective Jimenez had gone to the residence on March 25, 2021?

A    Yes.

Q    And you also knew that Detective Ralfie Hernandez had visited the residence at some point prior to that?

A    Before executing the search warrant?

Q    Yes.

A    Yes.

Q    And also before March 25, 2021, when Detective Castillo and Detective Jimenez visited the residence?

A    Wait.  Say that question again?

Q    Detective Ralfie Hernandez went to the residence before Detective Castillo and Detective Jimenez went --

A    That's correct.

Q    -- on March 25, 2021?

A    Yes.  Ralfie went in like February of 2021.  And then the other two detectives went in March of 2021.

Q    Okay.

    And I think you mentioned that you spoke with Detective Hernandez about his visit to the residence.

A    Correct.

Jensen - Cross - Hirozawa                110

Q     And he mentioned that he spoke with William Quinonez on that date.

A     Yeah.  It was brief, but he mentioned -- yes.

Q     And I think you said on direct that Mr. Quinonez thought that Detective Hernandez was there to talk with him about his son's application --

A     Or something about --

Q     -- to the academy, to the police academy?

A     Something about the son's application.

Q     But, in fact, Detective Hernandez was there to talk with him about the ongoing investigation into child exploitation.

A     That's my understanding.

Q     And Detective Hernandez asked Mr. Quinonez questions about the 1304 phone number during that prior visit?

A     I don't -- I don't remember.  I don't remember the phone call.

Q     Okay.

A     I don't remember anything else that was communicated.

Q     Okay.  But he was not, in fact, there to talk with Mr. Quinonez --

A     No.

Q     -- about his son's application to the NYPD academy?

A     Not yet.

Q     He works in the Computer Crimes Unit of the NYPD?

Jensen - Cross - Hirozawa                111

A       I think he did.  Yeah, he did.  He's since retired.

Q       So I have been informed.

A       Okay.

Q       And he was not there for recruitment purposes?

A       Not for recruitment, yes.

Q       Did you ask Detective Hernandez or Detective Castillo or Detective Jimenez about their observations of the property when they conducted those visits?

A       I didn't talk to the other two, and so I don't know what Detective Harkins also talked to them about.

Q       Okay.

A       And I don't remember the conversation with Detective Hernandez.

THE COURT:  Sorry, let me just ask.

So you spoke to Detective Hernandez, but Detective Harkins talked to Castillo and Jimenez?

THE WITNESS:  Well, he attempted to talk to Castillo, but could not get a hold of him because he retired.

THE COURT:  Okay.

THE WITNESS:  But he did talk to Jimenez and Jimenez said he vaguely -- he vaguely remembered and provided similar information.

THE COURT:  And so, if I understand the chain correctly, Detective Harkins spoke to Jimenez and at some

Jensen - Cross - Hirozawa                    112

point Detective Harkins conveyed to you what Jimenez told him?

THE WITNESS:  Correct.

THE COURT:  And that was prior to when you submitted the search warrant affidavit?

THE WITNESS:  Correct.

THE COURT:  Okay.  Thanks.

Go ahead.

Q    And based on your review of NYPD records and preparing the search warrant affidavit, you were aware that Detective Castillo and Detective Jimenez spoke with William Quinonez on March 25, 2021?

A    Correct.

Q    Even if you didn't speak with them yourself.

A    Correct.

Q    And you were aware that William Quinonez told Detective Castillo that another detective, Hernandez, had previously come to his home.

A    Correct.

Q    And that that detective had asked him the same questions as Castillo and Jimenez.

A    That's what the report said, yeah.

Q    And based on your review of NYPD records and your conversation with Detective Hernandez, none of those detectives ever observed Mr. Cruz at 78-11 87th Road?

Jensen - Cross - Hirozawa                    113

A    I wouldn't know -- I don't remember those conversations.

Q    Do you think it would have been memorable had they mentioned that they saw Mr. Cruz at the residence when they went to speak with William Quinonez?

A    I don't -- I don't remember the conversations.  I don't know what was -- what was said.

Q    So you have no recollection, sitting here today, of any detectives ever observing Mr. Cruz at 78-11 87th Road?

A    That's correct.

Q    You also, I presume, have no recollection of any of those detectives speaking with Mr. Cruz at any point before August 23, 2021?

A    Yeah, no one said they did.

Q    Okay.

A    That I remember.

Q    And you did not personally speak with Mr. Cruz before August 23, 2021?

A    That's correct.

          MS. HIROZAWA:  Could we pull up Government Exhibit 4?

          (Exhibit published.)

Q    So you reviewed these NYPD records in preparing the search warrant affidavit; is that correct?

A    That's correct.

Jensen - Cross - Hirozawa                114

MS. HIROZAWA:  Could we go to page 12, please?

Q    That includes the last entry in the NYPD records related to this investigation, correct?

A    I would say have to see it.  I don't remember.

MS. HIROZAWA:  If you could scroll down a little bit more and zoom in on the summary.  The topic/subject: Closing.

Q    Could you read what is included under Summary of Investigation?

A    Sure.  On March 25, 2021, at approximately 1240 hours, the U/S is requesting to close this case, C4, investigative leads exhausted.  The U/S was advised that the subject was represented by an attorney and as such, as invoked his right to remain silent.  Should new information become available, the U/S will reopen the case and investigate it accordingly.

MS. HIROZAWA:  And you can zoom out again and scroll down a bit.

Q    Just to be clear, no other information is provided in the closing summary notes?

A    I'm sorry, where am I looking?

Q    I am just confirming that that is the totality of the closing Summary of Investigation notes.

A    There's the information on the back -- or on the bottom.

Q    How would you describe the information at the bottom?

Jensen - Cross - Hirozawa                115

A     The report officer, the name, special investigations division.

Q     Is it fair to say that it's the name of the detective who prepared these closing notes and the name and information related to his supervisor?

A     Name, Cesar Castillo.

And I'm sorry, where is the supervisor?  Oh, reviewing, there you go.  Yes, okay.

Q     It doesn't include any other substantive information about why the case was closed?

A     No.

Q     Is it common practice, in your training and experience, to close a case when a suspect invokes his right to remain silent?

A     I -- I don't know.  I don't know.  That's not my report.  That's not my department.  I don't know what they do.

Q     Does your unit close cases when an individual invokes his right to remain silent?

A     Not to my knowledge, but I would ask if you want me to. I don't know.  I wouldn't.

Q     I would be grateful if they did.

So you mentioned on direct examination that even before the NYPD closed this case -- and sorry, I apologize, going back to this, can you read the activity date?

MS. HIROZAWA:  If we are able to get it back up on the screen?

A    Oh, yeah, it's March 25, 2021.

Q    And the activity time?

A    It's 1240.

Q    So that would be within a couple of hours of when they visited the residence and spoke with Mr. Quinonez?

A    I didn't -- I don't remember the time that they went, but --

Q    It's the same date?

A    Yeah, same date, exactly.

Q    Now, even before the NYPD closed their investigation into William Quinonez, you mentioned on direct that you had discovered other possibilities for potential suspects.

A    Other possibilities in the house, yes.

Q    And, in fact, you mentioned that in February 2021, in your request to open an FBI case, once another victim was discovered, which transferred jurisdiction to New York.

A    Yes, I recall.

Q    And you mentioned that also in a February 3rd e-mail to FBI Agent Thomas?

A    Yeah.

Q    In another jurisdiction?

A    Yes, yes, yes, yes, yes.

Q    What were those possibilities?

Jensen - Cross - Hirozawa                117

A     Other people in the house.

Q     Anyone besides Mr. Cruz?

A     We looked at everyone in the house.

Q     Was there anyone that you specifically looked at besides Mr. Cruz?

A     We looked at all the possibilities to include two children.  Well, we considered that, yeah.

Q     Okay.  Now, I want to talk a little bit about Mr. Cruz specifically.

      You didn't discover any photographs of Mr. Cruz on the minors' cellphones?

A     No, not to my recollection.

Q     And your investigation did reveal that the user of the 1304 phone engaged in video chats with some of the minors?

A     I think that's what the report says, but I would have to look at it.  Again, I haven't looked at their -- like, looked at all the documents together in five, six years.

Q     I believe that the search warrant affidavit discusses video calls with the minors.

A     Yes.

Q     So if you put it in the search warrant affidavit, is it fair to say that it's true and accurate?

A     Yes.

Q     And you didn't conduct any photo arrays with any of the minor victims?

Jensen - Cross - Hirozawa                    118

A    No.

Q    To your knowledge, none of your local law enforcement partners in other jurisdictions conducted photo arrays?

A    I would have to just -- I would have to consult the documents.  I -- I don't remember.

Q    To your knowledge, none of the minor victims identified Mr. Cruz in any photo array?

A    To my knowledge, no.

Q    Certainly, if they had, that would have been in the search warrant affidavit?

A    Yeah.

Q    It would have been pretty strong evidence to support your request for a warrant?

A    That's correct.

Q    And none of the minor victims identified Alex Cruz in any other form?

A    No, not to my memory, no.

Q    No voice identifications?

A    No.

Q    No other sort of identifications of any sort?

A    No.

Q    Now, I want to go back to the DOE records that you mentioned.

A    Okay.

        MS. HIROZAWA:  I have it listed as 3500-EJ-2.

Jensen - Cross - Hirozawa                    119

        (Exhibit published.)

Q    Now, this e-mail from the ACS contact --

A    Yes.

Q    -- does not contain any information about Alex Ricaurte or Alex Ricaurte Cruz?

A    Correct.  Well, I have the telephone number.

Q    Does it anywhere list Mr. Cruz's name?

A    No.

Q    It does not state Alex anywhere?

A    No.

Q    These records list the 1304 number as a phone number associated with Nick Ricaurte.

A    Right, that's correct.

Q    Date of birth March 23, 2002?

A    That's correct.

Q    And the same number was also associated with an individual named William Ricaurte.

A    That's correct.

Q    Date of birth, June 20, 2004?

A    That's correct.

Q    And the records don't include any other representation about who that number belongs to.

A    Not that e-mail, no.

Q    The e-mail does not state that the listed number is for a parent or guardian.

Jamie Ann Stanton, RMR, CRR, RPR
Official Court Reporter

Jensen - Cross - Hirozawa                    120

A     No, but in my training and experience, the number that --

Q     That wasn't the question.

A     Sorry.

Q     The Department of Education contact did not state in the e-mail to you that the number was for a parent or guardian.

A     That's correct.

Q     And you did not follow up with the ACS contact to clarify who that number belonged to.

A     No.

Q     The contact did not send you any other records from the Department of Education.

A     No.

Q     For example, formal school enrollment records.

A     No.

Q     And you did not request those.

A     No.

Q     You mentioned, on direct examination, that the Department of Buildings records, the search records you obtained --

            MS. HIROZAWA:  Could we pull up Government Exhibit 3 A, please.

            (Exhibit published.)

            MS. HIROZAWA:  And if we could zoom in on the

Jensen - Cross - Hirozawa                       121

section that says:  Department of Finance Building Classification.

That's fine.  It can be shorter.

Q    You mentioned that it's designated as an A5-1 family dwelling?

A    That's correct.

Q    Which is a single-family dwelling?

A    Yes.

Q    There is a note below that.

Could you read that note?

A    Sure.

Please note.  The Department of Finance's building classification information shows a building's tax status which may not be the same as a legal use of the structure. To determine the legal use of a structure, research the records of the Department of Buildings.

Q    And your counterpart, I believe it was, actually did follow up with the Department of Buildings?

A    My understanding was this was the record from the Department of Buildings.

Q    I think that Government Exhibit 3 documents Detective Harkins contacting someone at the Department of Buildings after obtaining this report.

MS. HIROZAWA:  Could we pull up Government Exhibit 3, please.

Jensen - Cross - Hirozawa                  122

(Exhibit published.)

MS. HIROZAWA:  And actually, if you could go down to the bottom portion, yes.

Q    Is it fair to say that Detective Harkins followed up with Mr. Hilltab at the Department of Buildings?

A    I would have to ask him.  I don't know if it was a followup.

Q    Oh, you think this may have taken place before you got the initial record?

A    No.  I would have to ask him what this indicates, but this looks like -- or refresh my memory.

Q    My understanding from the testimony on direct -- and I will let Mr. Dugan correct me if I'm wrong on this -- was that the Government Exhibit 3 A was obtained first through what appears to be an online search, and after identifying that and conducting the physical surveillance where you observed the garage and you weren't sure if the garage was attached to the home or on the same lot, your counterpart contacted the Department of Buildings to confirm the status of the garage.

Is that accurate?

MR. DUGAN:  I don't think that accurately --

THE WITNESS:  Yeah.

MR. DUGAN:  As best I can recall, that doesn't accurately restate the testimony.

Jensen - Cross - Hirozawa                123

Q   What is your recollection of the timeline of events?

A   So the surveillance at the site, where we see the garage, we are unsure if that's part of the home, and then we do additional steps to then obtain these documents.

Q   Okay.

A   So my understanding is these documents were after.  And based on the 302 date, I think it's like August 3, 2021. And we went out July 13, 2021.

Q   Right.  So the document that says A5-1 on it, my understanding or my assumption, perhaps, was that that was obtained before this followup with the Department of Buildings.

     In any event, the exact timeline is a bit irrelevant.

A   Okay.

Q   You or your counterpart followed up with the Department of Buildings about the garage on the neighboring lot.

A   I don't know.  I don't remember.  I don't -- go ahead.

Q   I'll rephrase.

     You or your counterpart contacted the Department of Buildings to clarify the status of the garage on the neighboring lot?

A   That's correct.

Q   You did not contact the Department of Buildings at any point to clarify the status of the main building at 78-11

Jensen - Cross - Hirozawa                    124

87th Road?

A     I did not, no.

Q     You did not, in other words, follow up on the note that indicated that the A5-1 classification was only for tax purposes and did not describe the legal use of the building?

A     I don't -- I did not follow up.  I don't believe there was followup.

Q     Okay.

       On direct, you spoke a little bit about the different drafts of the search warrant affidavit that you prepared.

A     Yes.

Q     So just to clarify, the search warrant application that was signed by Judge Mann was the third draft that you prepared?

A     That's correct.

Q     And the two prior drafts were 3500-EJ-35 and 3500-EJ-36?

A     That's correct.

       MS. HIROZAWA:  And Your Honor, I think the Government already made this request, or perhaps the Court made this request.  If we could just have all 3500 materials that were referenced admitted as exhibits to this hearing.

       THE COURT:  So all the ones that have been referenced today.

Proceedings                                          125

Why don't we do this for the sake of clarity? After the hearing, you can all just agree to assign them individual exhibit numbers so that they are separate documents and just reference the 3500 numbers because that's how they'll be reflected in the transcript.

MS. HIROZAWA:  Happy to do that.

THE COURT:  Great.

MS. HIROZAWA:  One moment, Your Honor.

(Pause in proceedings.)

MS. HIROZAWA:  No further questions.  Thank you.

THE COURT:  Okay.  Thanks.

Any redirect?

MR. DUGAN:  No.  Nothing further, Your Honor.

THE COURT:  Okay, great.

Agent Jensen, you are excused.  Thank you very much.

THE WITNESS:  Thanks.

(Witness excused.)

THE COURT:  And once you leave, I will speak with the parties about anything further.

The witness has left the courtroom.

Does either party have any additional witnesses to present at this hearing?

MR. DUGAN:  Not the Government, Your Honor.

MS. HIROZAWA:  No, Your Honor.

Proceedings                                          126

THE COURT:  Any additional exhibits you want to make part of the record that are not already on record?  I know there were some filed with the motion papers.  I'm going to assume those are all part of the record, but is there anything else that you would like to enter into evidence?

MR. DUGAN:  No, Your Honor.  Thank you.

MS. HIROZAWA:  No, Your Honor.

THE COURT:  So let's talk briefly about scheduling and next steps.

I know Ms. Hirozawa had mentioned the possibility of some post-hearing briefing.  I think what actually what would be most helpful to me is simply to have oral argument and not have any further briefing at this point.  I think between what you have all already submitted and my own review of and some independent research into the caselaw, I have a fairly good sense of the legal standards that govern and the primary cases that you all are relying on.

When we have argument, if there are particular cases you want me to go back and take a look at, or there are ones you have found and haven't mentioned yet, you are welcome to just come prepared to tell me about those authorities.

Part of the reason is I, as I think you all know, I am starting a criminal trial Monday and then I have a bit

Proceedings                                    127

of a window the last couple weeks of May and then I am basically out of pocket with another trial starting in early June.

So I did speak with the court reporter who said she thought she could get you the official transcript of today's proceeding in the next couple of days, maybe even as soon as tomorrow.

So I would like to look at scheduling argument while this is still fresh in my mind either the week of May 18th or May 25th.

The 25th is Memorial Day, and I may be remote on the 29th, but I have some availability on those other days.

Do you all have a preference?

MR. DUGAN:  I would just prefer earlier, if possible, Your Honor.

THE COURT:  Okay.

MS. HIROZAWA:  The week of the 18th is fine with me.

THE COURT:  Okay, great.  Let me just look at my calendar really quickly.

How about Thursday, the 21st?  I am clear in the afternoon, so we could say 2 o'clock?

MS. HIROZAWA:  I apologize.  That's the one day that I can't.

THE COURT:  Not a problem.  Let me look really

Proceedings                                        128

quick at some of these other options.

(Pause in proceedings.)

THE COURT:  Sorry, Ms. Hirozawa, you are out all day on the 21st?

MS. HIROZAWA:  I have set aside the full day for an MDC settlement conference with Judge Kuo.

THE COURT:  Understood.

MS. HIROZAWA:  If I have an excuse to leave early, I would be happy to, but --

THE COURT:  I would rather not do that on that important matter.

On the 20th, I have a sentencing in the morning, but I should be clear in the afternoon.  So just to give me enough time, why don't we say 2:30 p.m. on May 20th.

Does that work for everyone?

MR. DUGAN:  Yes, Your Honor.

THE COURT:  Is that all right for the defense, May 20th at 2:30?

MS. HIROZAWA:  Yes, Your Honor.

THE COURT:  I will see you then for argument.

Thank you very much.

And we are adjourned.

And this may already be covered, but in the interest of justice, I will exclude time until May 20th in light of the pending motion.

Thank you.

THE COURT:  Take care.

(Matter adjourned.)

*    *    *    *    *


I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/ Jamie Ann Stanton                April 30, 2026
_____      _____
 JAMIE ANN STANTON                      DATE

Jamie Ann Stanton, RMR, CRR, RPR
Official Court Reporter